[Cite as *A.A.O. v. A.M.O.*, 2022-Ohio-2767.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| A.A.O., | : | |
| Plaintiff-Appellant, | : | Nos. 110338 and 110349 |
| v. | : | |
| A.M.O., | : | |
| Defendant-Appellee. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED
IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** August 11, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-20-380221

### *Appearances:*

Stafford Law Co., L.P.A., Joseph G. Stafford, and Nicole A.
Cruz, *for appellant*.

TM Wilson Law Group, LLC, and Thomas M. Wilson, *for
appellee*.

EMANUELLA D. GROVES, J.:

{¶ 1} Plaintiff-appellant A.A.O. ("Wife") appeals from the trial court's judgment entry of divorce. For the reasons that follow, we affirm in part, reverse in part, and remand for the limited purpose of recalculating the child support order.

**Factual and Procedural History**

{¶ 2} Wife and A.M.O. ("Husband") were married on July 28, 2002, and the couple had four children during the marriage (L.O. d.o.b. May 25, 2004, E.O. d.o.b. August 24, 2007, Al.O. d.o.b. June 23, 2008, and An.O. d.o.b. June 3, 2010).

{¶ 3} On January 31, 2020, Wife filed a complaint for divorce.[1] On February 11, 2020, Wife filed an emergency motion for an order requiring Husband to purchase a replacement vehicle for Wife. On February 14, 2020, Husband filed his answer and counterclaim for divorce. On February 20, 2020, Husband filed a reply brief to Wife's emergency motion. On February 24, 2020, the court appointed a guardian ad litem ("GAL") for the minor children.

{¶ 4} Trial took place on August 4, 5, 6, and 10, 2020. The court heard testimony from Wife, Husband, the GAL, and numerous witnesses including the valuation expert Stephen Barnes.

{¶ 5} On September 11, 2020, the parties submitted written closing arguments.

---

[1] This was the third time the parties had filed for divorce. The first complaint for divorce was filed by Wife and was voluntarily dismissed. The second complaint was filed by Husband and was set for trial but was ultimately dismissed without prejudice by agreement of the parties.

{¶ 6} With respect to division of property, the property at issue includes a Shell gas station business ("Petro to Go"); the marital home in Strongsville, Ohio; a rental property in Cleveland, Ohio; the Midnight Smoke Shop ("Midnight Smoke Shop"); Wife's jewelry; and Konni's, a grocery store business, and the debts at issue are the mortgage for the marital home, credit card debt, and other debt of the parties.

{¶ 7} Petro to Go is a gas station owned by Husband and located in Rocky River. The parties do not dispute that Husband owns Petro to Go. Valuation expert Stephen Barnes ("Barnes") testified that Husband borrowed funds from his brother to purchase the gas station and rented the land on which the gas station is located from his brother. At the time of the trial, Husband had been in default of the rent payments for two years. Barnes testified that based on two different valuation approaches, the Income approach and the Market approach, Petro to Go was valued at $172,148, and the court accepted this valuation.

{¶ 8} The parties purchased the marital home in April 2006, using a $75,000 down payment. Husband testified that the down payment came from his premarital savings account. Wife testified that the down payment came from Husband's parents. The home was refinanced, initially to avert balloon payments and rate increases, and later to absorb credit card debt and to purchase a vehicle for Wife. The trial court found that as of November 2018, the outstanding principal due for the home was $170,453.82, and the value of the home pursuant to the

County Financial Office was $280,400. With respect to the value of the marital home, the trial court made the following findings:

> [Wife] testified that she has always wanted to update the home. She has used [Husband's] absence to initiate repairs. For example, she took a hammer to a wall in the kitchen. She ultimately hired someone to take out the entire wall. Currently, there is a temporary board on the floor between the flooring in what was two different rooms. In addition, she over fertilized the grass, causing most of it to die. She therefore requested new landscaping and sod to be planted. She has a plan to replace all the flooring in the home at an estimated cost of $25,000, to paint, and to move some walls and create a room for her son over the garage, while expanding her room into his old room. She testified that if the work she has started, the painting and the landscaping would be completed, the house *would be* worth $300,000, but if she did all her updates it *would be* worth $350,000. [Wife] said the estimates for the repairs and remodeling beyond the numbers she recalled were in her bedroom.
>
> Some of the funds that she has used for the updates started or completed came from support she received during the first year of this case when she was "on strike" and refused to shop for food or cook for the children. [Husband] called in orders for food for the children and [Wife] during this time in addition to his direct and indirect support of the family. Other times [Husband] has paid some of the expenses she has incurred unilaterally.

(Emphasis sic.)

{¶ 9} The parties own a rental property on West 104th Street in Cleveland. Husband purchased the property outright for $29,000; there is no mortgage on the property. The trial court determined that the value of the property was $29,000.

{¶ 10} Midnight Smoke Shop is a store located in Cleveland that sells vaping equipment. Wife insisted throughout the proceedings in this case that Husband was a true owner of this business. Evidence presented at trial with respect to this alleged asset included Husband's tax returns, the business's operating agreement,

an affidavit from one of the owners, and testimony from Husband and one of the owners. This evidence showed that Husband assisted the owners in starting the business and has worked at the business as a W-2 employee since its inception in 2017. The valuation expert testified at trial that the operating agreement for the business reflects that the limited liability company was formed with three members. Husband was not listed as an owner in the operating agreement, but the agreement did provide an option for him to buy shares of the business for an unspecified amount. Based on the evidence presented at trial, the trial court declined to consider Wife's arguments that this business arrangement was somehow indicative of fraud and ultimately declined to consider Midnight Smoke Shop in its division of property.

{¶ 11} Wife was given gold jewelry when she married Husband. Wife, her uncle, and her three sisters testified about this jewelry. The trial court found that Wife's undisputed testimony was that the gold jewelry would be worth about $100,000 today. The trial court also made the following findings:

> All the above witnesses testified to all or part of the following story and no one disputes it. At [Wife's] sister Haneen's wedding in 2015, [Husband's] mother, Shama, asked [Wife] to give her all the jewelry she was wearing. [Wife] took it off and gave it to Shama. [Wife] testified that [Husband] told her that the gold is with Basem, [Husband's] brother. [Husband] testified that he is not 100% sure that Basem has the gold, but it is likely. [Wife] testified that she was told that Basem wanted the gold because they owed so much money to him for the Shell station. Some of the above witnesses testified that Basem's wife was holding the jewelry after Shama took it.
>
> [Husband] purchased the Shell station from his brother Basem who is also his landlord. [Husband] testified to being in arrears on the rent.

There is a letter from Basem's attorney regarding the arrears * * * and a pledge agreement for him for the Petro to Go shares * * *. These occurred after the jewelry was taken from [Wife.]. Basem is living in Palestine with his family and has been there, according to his affidavit, since July 2019. The Court notes that [Wife] wants her value for the Shell station, but that she also wants her jewelry. If the jewelry was given for debt repayment or collateral for debt for the Shell station, then [Wife] cannot have both half the value of the Shell station and her jewelry. If not, and the jewelry was taken from [Wife] by Shama and given to Basem's wife for some other reason, it still is not a matter for this Court since [Wife] gave it over willingly. In addition, Basem was joined as a party. However, no one has testified that Basem took the jewelry or had the jewelry at the wedding; there is no clear testimony only hearsay and conjecture that he is holding the jewelry. Therefore, he should be dismissed as a party to this action and the Court declines to award to either party this jewelry that was given away in 2015.

{¶ 12} Konni's is a grocery store located in East Cleveland that was previously owned and operated by Husband's parents. Husband worked at the store from childhood through his marriage. In 2018, the business was sold. While Husband assisted the buyers with the transition of the business, he has not worked there since, and Husband has no interest in the business. The court found that Konni's was not a consideration in this matter because the property was no longer owned by Husband's family.

{¶ 13} With respect to the parties' liabilities, in addition to the mortgage and other debts mentioned above, the court found that immediately prior to trial, Husband had purchased Wife a 2020 Kia Telluride for $48,000; the Mercedes that Wife had previously used was traded in, leaving a debt of $45,000. Husband also testified that he had traded in his 2008 Honda Odyssey with over 250,000 miles for a 2008 Dodge Caravan for $500 down and a loan of $7,000.

{¶ 14} Additionally, Wife testified regarding her credit card debt, totaling over $21,500 across 14 accounts. Husband testified regarding his credit card debt, totaling $57,477. The trial court noted that several of the accounts listed by Husband seemed to overlap with Wife's, and factoring in the overlap, the court ultimately found that the total debt of both parties was $75,210. Husband testified that he used his tax refund to pay down some of the debt. Wife testified that she expects Husband to continue to pay her debts. With respect to this debt, the trial court found:

> One of the issues in the marriage was the spending of the parties. [Husband] attended college and worked at his parents' store at the beginning of the marriage; then, he purchased the Shell station where he worked while still working for his parents' store; and, in late 2017 and 2018 he worked at the smoke shop in addition to the Shell station and his parents' store. Since the store was sold, he has only worked at the Shell station and the smoke shop. [Husband] pointed out that he can't continue to work 16 to 18 hours per day and that doing so has spoiled his relationship with his children. Despite his long workdays his earnings were never enough to pay for the lifestyle that [Wife] lived as apparent above.

{¶ 15} On February 4, 2021, the court issued a judgment entry of divorce, and on February 26, 2021, the court issued a nunc pro tunc judgment entry for divorce with findings of fact and conclusions of law.

{¶ 16} The court found that because Husband's testimony and exhibits were credible in establishing that the $75,000 down payment for the marital home came from funds from his mother, $75,000 of equity in the marital home should be credited to Husband as separate property. The court further awarded Husband's interest in the marital home to Wife. The court ordered Husband to execute a deed

in favor of Wife within 45 days of its order and further ordered Wife to refinance the home within 24 months of its order. The court ordered that until Wife refinanced or sold the home, Husband would pay the monthly mortgage and homeowner's insurance as a credit against his spousal support order.

{¶ 17} The court awarded Wife's interest in the rental property to Husband. The court also awarded Husband full interest in Petro to Go, without any claim by Wife. Further, the court ordered that Wife was awarded the Kia Telluride and Husband was awarded the Dodge Caravan, with the provision that for as long as Husband was obligated on the lien for the Kia, he would hold the title and continue to provide automobile insurance. The court ordered that after 48 months, Husband would no longer be responsible for the monthly payments and Wife would either refinance or sell the vehicle to relieve Husband of that obligation. The court found that each party would be responsible for the debt in their respective names. The court further found that the difference between the parties' property division of approximately $32,445 could be partially alleviated by the past due taxes for the marital home and Husband's support arrearage being passed to Wife.

{¶ 18} With respect to spousal support, the court considered the factors enumerated in R.C. 3105.18(C)(1)(a) through (n). Considering R.C. 3105.18(C)(1)(a), the income of the parties, the court found:

> [Wife] has no income. During these proceedings the Court and the GAL encouraged her to pursue assistance through Cuyahoga Community College Women in Transition program. The parties were engaged when [Wife] was 16 and married when she was 17 before her senior year in high school. She [has] a high school diploma or the equivalent

pursuant to the Request for Admissions that are deemed admitted due to [Wife's] failure to respond. The parties have been married since July 28, 2002, for 18 years. [Wife] never worked outside the home.

[Husband] has worked outside the home since he could push a broom at his parents' grocery store. By the time of the parties' marriage, [Husband] was attending college and working for the family grocery store. He continued to work there until that business was sold. Once he purchased the Shell station, he worked at both the Shell station and the grocery store. Once Midnight Smoke Shop was initiated, he worked there too. [Husband] testified to 16 to 18-hour days. All agree that [Husband] spent a good deal of time away from home. He acknowledges now that he sacrificed time with his children to provide for them financially and to pay the bills that [Wife] incurred.

Using Husband's tax returns, rental income, and business documents, the court found that Husband's 2018 income was $108,598.

{¶ 19} The court ultimately found:

[I]t is appropriate and reasonable for Husband to pay spousal support to Wife in the amount of $3500 per month, for a term of 48 months, commencing on January 1, 2021, subject to either parties' death or Wife's remarriage. The Court, however, finds that [Husband] is obligated on the mortgage for the marital home and the monthly debt for [Wife's] Kia Telluride and [Wife] has no means to pay either obligation beyond her spousal support. In addition, it is in Husband's best interest to continue to maintain insurance for both the marital home and the automobile so long as he is obligated on the debt for those items. Therefore, [Husband] should pay the monthly mortgage payment of $950 per month and the Kia Telluride monthly payment of $700 directly to the lien holders plus the homeowner's and automobile insurance ($136.42 per month per [Wife's] exhibit 67) directly to the provider and subtract that sum of $1736 from the $3500 per month. The approximately $11,680 that [Wife] owes [Husband] for the property division should be deducted at a rate of $200 per month for 48 months. Although it is less than $11,680 over 48 months, it accounts for the increase in past due real estate taxes likely to have occurred since the evidence presented for 2019 real estate taxes. In addition, [Wife's] child support obligation should be deducted from her monthly spousal support obligation. The order for support is subject to the Court's continuing jurisdiction for adjustment should the mortgage payment be increased or decreased, should the homeowner's

insurance be cancelled, or the marital residence be refinanced in [Wife's] name or be sold.

{¶ 20} With respect to the allocation of parental rights and responsibilities, the court found that while neither party filed a motion for shared parenting, the GAL requested an order awarding shared parenting. Ultimately, after considering the factors enumerated in R.C. 3109.04(F)(1), the court found that it was in the best interests of the children to allocate the parental rights and responsibilities for the care of the children primarily to Husband. The court further found that it was in the children's best interests that Wife have parenting time from 9 a.m. to 4 p.m. Monday through Friday while the children attended school virtually; once the children resumed attending school in person, Wife would have custody of the children Wednesdays from 4 p.m. to the start of school on Thursdays, or 4 p.m. on Thursdays when school was not in session. In addition, Wife would have custody of the children on alternating weekends. The court also ordered Wife to commence individual therapy "which should include managing her outbursts and education on appropriate boundaries for parenting."

{¶ 21} With respect to child support and cash medical support obligations, the court found that Wife was the child support obligor and Husband was the child support obligee. The court found that Wife was "voluntarily unemployed" and that there was no impediment to her "earning at least minimum wage for some hours per week." Therefore, the court imputed income to Wife in the amount of $12,000 per year, "which is less than a full-time minimum wage earner can earn but

considers her need for some training." The court ultimately found that Wife had an annual child support obligation of $11,052.35 and an annual cash medical support obligation of $688.15, or a monthly obligation of $978.38 for child support and cash medical support.

{¶ 22} Finally, the court denied Wife's request for attorney fees. The court found specifically that

> [Wife] repeatedly criticized the Court for failing to assist her. The record reflects the opposite. The valuations occurred upon the order and appointment by the Court and with funds provided by [Husband]. The final attorney for [Wife] was hired with funds the Court ordered [Husband] to provide. [Wife] refuses to take any responsibility for her expenditures, including the attorney fees. This matter could have been resolved but for the refusal of the parties, but [Wife] in particular, to stipulate to the financial realities and of [Wife] to refuse to resolve the parenting issues except upon her terms, which included [Husband] being excluded from the children's life except when she allows his visits.

Based on this, the court found that while Wife's requested attorney fees were reasonable, they were not Husband's responsibility and found that each party was responsible for their own attorney fees.

{¶ 23} Wife appeals, presenting six assignments of error for our review:

> I. The trial court erred as a matter of law and abused its discretion in its determination of separate property.
>
> II. The trial court erred as a matter of law and abused its discretion by issuing a division of property that is not reasonable or equitable.
>
> III. The trial court erred as a matter of law and abused its discretion in its allocation of parental rights and responsibilities for the parties' four minor children.
>
> IV. The trial court erred as a matter of law and abused its discretion in its calculation of child support.

V. The trial court erred as a matter of law and abused its discretion as to the term and amount of spousal support.

VI. The trial court erred as a matter of law and abused its discretion by denying the appellant's request for attorney fees.

**Legal Analysis**

**I. Standard of Review**

{¶ 24} "'The Ohio Supreme Court has long recognized that a trial court must have discretion to do what is equitable upon the facts and circumstances of each divorce case.'" *O'Neal v. O'Neal*, 8th Dist. Cuyahoga No. 110114, 2022-Ohio-372, ¶ 19, quoting *Feldman v. Feldman*, 8th Dist. Cuyahoga No. 92015, 2009-Ohio-4202, ¶ 11, citing *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989).

{¶ 25} The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**II. Division of Property**

{¶ 26} Because Wife's first and second assignments of error are related, we will address them together. In Wife's first assignment of error, she argues that the trial court erred as a matter of law and abused its discretion in its determination of separate property. Specifically, Wife argues that the trial court erred when it found that $75,000 of equity in the marital residence was Husband's separate property and when it failed to find that Wife's gold jewelry was her separate property. In Wife's second assignment of error, she argues that the trial court erred and abused

its discretion by issuing a division of property that is not reasonable or equitable. Specifically, she argues that it was improper and unequitable to award Husband income properties and a separate property interest in the marital property, as well as to allocate $50,659 of alleged credit card debt to Wife.

{¶ 27} R.C. 3105.171(B) provides that

[i]n divorce proceedings, the trial court shall * * * determine what constitutes marital property and what constitutes separate property. In either case, upon making such a determination, the court shall divide the marital and separate property equitably between the spouses, in accordance with this section.

R.C. 3105.171(A)(6)(a)(ii) defines "separate property" as "any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage." "Separate property" also includes "any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." R.C. 3105.171(A)(6)(vii).

{¶ 28} A trial court's characterization of property as marital or separate property is a mixed question of law and fact and will not be reversed unless it is against the manifest weight of the evidence. *Saks v. Riga*, 8th Dist. Cuyahoga No. 101091, 2014-Ohio-4930, ¶ 35, citing *Williams v. Williams*, 8th Dist. Cuyahoga No. 95346, 2011-Ohio-939, ¶ 8. "'We will not reverse a judgment as against the manifest weight of the evidence if it is supported by some competent, credible evidence.'" *Dayal v. Lakshmipathy*, 2020-Ohio-5441, 163 N.E.3d 683, ¶ 26 (6th Dist.), quoting *Sullinger v. Sullinger*, 6th Dist. Lucas No. L-18-1079, 2019-Ohio-

1489, ¶ 41. Further, the weight of the evidence and the credibility of the evidence are primarily for the trier of fact — here, the trial court — to determine. *Pruitt v. Pruitt*, 8th Dist. Cuyahoga No. 84335, 2005-Ohio-4424, ¶ 6, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

**A. The Down Payment**

{¶ 29} The trial court found that Husband was able to trace at least $57,140.78 of the $75,000 down payment from a premarital account of $89,000 that Husband's mother helped him start as a child. The court further found that Husband's testimony and exhibits related to this property were credible and that "despite the denial of this issue in her closing argument, the Wife testified that the down payment for the house came from his parents from money that they had saved for him since he was a child."

{¶ 30} Wife argues that this was insufficient for the trial court to conclude that the entire down payment was Husband's separate property because Husband was unable to establish the entire $75,000 came from his premarital account or adequately trace the down payment from any such premarital account. Our review of the record further confirms that in addition to the Husband's evidence described above that the trial court deemed credible, Wife herself testified that the down payment for the marital home came from Husband's parents.

{¶ 31} Therefore, the trial court's determination that the $75,000 down payment was Husband's separate property was clearly supported by competent and credible evidence.

**B. The Gold Jewelry**

{¶ 32} Wife also argues that the trial court erred in failing to find that Wife's gold jewelry was her separate property and likewise failing to allocate the value of that property to Wife.

{¶ 33} The trial court made multiple references to the gold jewelry in its judgment entry. In its discussion of separate property, the trial court explicitly found that

> [t]he Wife has no separate property beyond some jewelry that was given to her by her family at the time of her marriage. To the extent that this jewelry exists and is in her possession, it should be retained by her.

In its discussion of the valuation of Petro to Go, the trial court found that Wife and numerous relatives testified as to the gold jewelry, its undisputed value of $100,000, and the incident in which Wife gave the jewelry to Husband's mother Shama, ostensibly in connection with Husband's debt to his brother Basem related to Petro to Go. The trial court went on to find that

> [Wife] wants her value for the Shell station, but she also wants her jewelry. If the jewelry was given for debt repayment or collateral for debt for the Shell station, then [Wife] cannot have both half the value of the Shell station and her jewelry. If not, and the jewelry was taken from [Wife] by Shama and given to Basem's wife for some other reason, it still is not a matter for this Court since [Wife] gave it over willingly. In addition, Basem was joined as a party. However, no one has testified that Basem took the jewelry or had the jewelry at the wedding; there is no clear testimony only hearsay and conjecture that he is holding the jewelry. Therefore, he should be dismissed as a party to this action and the Court declines to award either party this jewelry that was given away in 2015.

{¶ 34} Wife argues that evidence presented at trial shows that the gold was in Basem's possession as rent payment and, therefore she sufficiently traced her separate property to Petro to Go. Husband testified that he believed Basem had the gold because Husband owed him money. While Wife asserts now that Shama took the gold, the record contains conflicting testimony, including from Wife herself, as to whether or not Wife voluntarily gave Shama the gold. Further, we note that while the trial court described the jewelry as having an undisputed value of $100,000, this amount came from Wife's testimony, and the record reveals that the jewelry was never formally appraised. Even assuming that Wife did not voluntarily relinquish the jewelry and that the jewelry was given to Basem as rent payment for Petro to Go, the record contains no information as to the details of this payment. The record lacks both a valuation of the jewelry based on anything beyond Wife's testimony and any documentation showing that the jewelry was used as a payment that would create an interest in Petro to Go. In the absence of such evidence, Wife failed to prove by a preponderance of the evidence that any gold jewelry no longer in her possession constitutes separate property. Therefore, the trial court did not err in holding that any gold jewelry currently possessed by Wife constitutes her separate property and that any gold jewelry given away in 2015 is not separate property that could be awarded to either party. Therefore, Wife's first assignment of error is overruled.

**C. Division of Property**

{¶ 35} In her second assignment of error, Wife argues that the trial court erred and abused its discretion when it issued a division of property that was not reasonable or equitable. Wife specifically argues that it was unreasonable and unequitable for the trial court to award Husband the rental property on West 104th Street, to order Wife to refinance the marital home within two years, and to allocate over $50,000 of credit card debt to Wife.

{¶ 36} We reiterate that we review a trial court's division of property under an abuse of discretion standard. *Strauss v. Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, ¶ 35, citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 131, 541 N.E.2d 597 (1989). We review a trial court's property division "'as a whole, in determining whether it has achieved an equitable and fair division of marital assets.'" *Victor v. Kaplan*, 2020-Ohio-3116, 155 N.E.3d 110, ¶ 26 (8th Dist.), quoting *Tyler v. Tyler*, 8th Dist. Cuyahoga No. 93124, 2010-Ohio-1428, ¶ 24, citing *Briganti v. Briganti*, 9 Ohio St.3d 220, 222, 459 N.E.2d 896 (1984). R.C. 3105.171(C)(1) mandates an equal division of marital property, or "'if an equal division is inequitable, the court must divide the marital property equitably.'" *Id.*, quoting *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, ¶ 5. In determining what constitutes an equitable division, the trial court must consider the factors outlined in R.C. 3105.171(F), including the duration of the marriage, the assets and liabilities of the spouses, the economic desirability of retaining intact an

asset, and any other factor that the court expressly finds to be relevant and equitable. *Id.*

{¶ 37} The record reflects that the trial court considered the R.C. 3105.171(F) factors in determining its division of marital property. The trial court considered that the parties refinanced the marital home numerous times for the purpose of paying down consumer debts incurred by Wife. The trial court also considered that Wife initiated numerous projects at the marital home which, though perhaps well-intentioned, remained unfinished at the time of the trial. The trial court also considered that in addition to the support payments Husband made to Wife throughout the divorce proceedings, Wife would frequently visit Petro to Go and take approximately $1,000 per week in cash from Husband's business.

{¶ 38} Wife argues that the assets awarded to Husband — Petro to Go and the rental property — are income-producing, whereas the Wife was awarded an asset — the marital home — that is encumbered by a mortgage and outstanding property taxes. While this is correct, this argument fails to account for additional complexities. Specifically, the trial court acknowledged that Petro to Go carried a looming financial burden of replacing its gas storage tanks at a cost of nearly $300,000, owed nearly $50,000 in outstanding sales tax, and Husband had been behind in his rent payments for the business for at least two years. Additionally, the court recognized Wife's financial position by ordering Husband to continue to pay the mortgage and insurance for four years.

{¶ 39} With respect to the credit card debt, the record, including Wife's own testimony, reflects that the majority of the debt was incurred by Wife. We are mindful that for the duration of the parties' 18-year marriage, Wife was responsible for purchasing food and clothing for the children. We are also mindful, however, that Husband paid the mortgage and bills and regularly provided Wife with cash. This credit card debt, then, which included consumer debt from numerous retail credit cards, including credit cards for women's clothing, was presumably not incurred to exclusively provide for the basic necessities of the children. Wife testified that she provided a lavish lifestyle for her children. Further, the trial court acknowledged Wife's spending by finding that Wife "has refused to accept the limits of [Husband's] ability to pay" and has "made no adjustment in her lifestyle, in fact, she has incurred significant new expenses to the home due to her 'remodeling' some of which the Court doubts have added value to that premises and to her 'fertilizing' which clearly reduced the value of the home."

{¶ 40} Having reviewed the record, and viewing the division of property as a whole, we cannot conclude that the trial court's division of property was unreasonable, arbitrary, or unconscionable. Therefore, Wife's second assignment of error is overruled.

## III. Parental Rights and Responsibilities

{¶ 41} In her third assignment of error, Wife argues that the trial court erred and abused its discretion in its allocation of parental rights and responsibilities of the parties' four children. Specifically, Wife asserts that the trial

court's designation of Husband as the residential parent and legal custodian of the children and corresponding grant to Wife of limited parenting time as unreasonable, improper, and not in the children's best interest. Wife argues that evidence presented at trial showed that she was an amazing mother and was almost entirely responsible for caring for the children for the duration of the marriage. She further argues that evidence showed that Husband was minimally involved with the children.

{¶ 42} This court has held:

> When reviewing a ruling pertaining to the allocation of parental rights, the trial court is to be afforded great deference. *Miller v. Miller*, 37 Ohio St.3d 71, 523 N.E.2d 846 (1988). "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." *Id*. at 74 (internal citations omitted).

*Strauss v. Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, ¶ 8. Therefore, we must uphold the trial court's allocation of parental rights and responsibilities absent an abuse of discretion. *Id*.

{¶ 43} The trial court in this case was deeply familiar with the parties in this case, having presided over all three iterations of this divorce case over the course of over three years. Pursuant to R.C. 3109.04(B)(1), the trial court was required to consider the best interest of the children when allocating parental rights and responsibilities. *O'Malley v. O'Malley*, 8th Dist. Cuyahoga No. 98708, 2013-Ohio-

5238, ¶ 68. In making a best interest determination, the court must consider the factors enumerated in R.C. 3109.04(F)(1).

{¶ 44} Pursuant to its consideration of the factors laid out in R.C. 3109.04(F)(1), the court found that Wife interfered with the children's relationship with Husband by making outrageous and hate-filled statements about and to Husband. The court also found that "although the children are soldiers in this case for their Mother, the Court cannot in good conscience endorse her as the best parent or her ongoing parenting as in their best interests." The court made findings related to Wife's mental health, stating:

> As to [Wife's] mental health, it could be in question if one assumes that inappropriate violence and an arrest record could be an outgrowth of mental health issues. Prior to this case, [Wife] was arrested in 2016 for domestic violence against [Husband.] She said she used her false nails to scratch him and took his car to flee. The charge was reduced to disorderly conduct. The previous year she was arrested for driving under the influence, which she described as a mistake.

The court also noted additional examples of volatile behavior. Wife testified that she repeatedly took a hammer and violently smashed wall-mounted televisions in the marital home because she did not know how to get them off of the wall. The record also reflects numerous incidents in which Wife went to Petro to Go and had violent outbursts and bullied the gas station's employees. Wife testified that she had numerous self-described "breakdowns" throughout this case.

{¶ 45} With respect to which parent would be more likely to honor and facilitate court-approved parenting time rights, the court found that Wife failed to facilitate or honor parenting time throughout the proceedings and was

unsupportive of Husband's time with the children. Further, the court noted that the GAL recommended shared parenting largely so that Husband would remain a part of the children's lives, but found:

> After consideration of the factors for allocation of parenting and for shared parenting, and based on the foregoing reasons, the Court cannot support the GAL's plan for the exercise of shared parenting. The choice here is between the Mother and the Father. Although [Wife] has been a caretaker of the children, [Wife's] selfish behavior, including "going on strike" and failing to take the children for their regular doctor appointments, and the negative impact on the children with her hate speech, selfishness, and violence, all of which they have been privy to, results in the Court being unable to sustain her caretaking [role] or designate her as the primary caretaker. [Wife] has used the children to extort [Husband] for her own purposes. [Wife's] vitriol about this case and [Husband] has blinded her to her children's needs, even the basic ones such as routine checkups. It would be in the children's best interests that [Wife] attend anger management courses, individual therapy, and parenting courses. The court has little hope or expectation that [Wife] would follow any orders herein after the divorce any more than she did before the divorce. Therefore, eliminating her contact with the children would be futile, but limiting it is necessary.

{¶ 46} Wife argues that evidence presented at trial showed that she was an amazing mother and was almost entirely responsible for caring for the children for the duration of the marriage. She further argues that evidence showed that Husband was minimally involved with the children. Indeed, it appears from our review of the record that one of the fundamental issues in the parties' marriage is that Husband worked extremely long hours to provide for his family, perhaps at the expense of spending time with his children. However, in light of the foregoing findings made by the trial court and our review of the record, we cannot conclude that the parties' division of familiar responsibilities prior to the divorce proceedings

compels a different allocation of parental rights and responsibilities in this case. Because the trial court's allocation of parental rights and responsibilities was not unreasonable, arbitrary, or unconscionable, we find no abuse of discretion. Therefore, Wife's third assignment of error is overruled.

## IV. Child Support

{¶ 47} In Wife's fourth assignment of error, she argues that the trial court erred and abused its discretion in its calculation of child support. Wife specifically challenges the trial court's finding that she was voluntarily unemployed and its decision to "impute income" to her. Wife argues that this finding ignored the realities of the COVID-19 pandemic. Finally, Wife argues that the trial court erred in its calculation of her gross income by using an inaccurate figure for spousal support.

{¶ 48} R.C. 3119.02 governs the calculation of child support and provides that a parent's child support obligation shall be calculated "in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Sections 3119.02 to 3119.24 of the Revised Code." *S.E.J. v. C.S.J.*, 8th Dist. Cuyahoga No. 107576, 2019-Ohio-3274, ¶ 18, citing R.C. 3119.02 and *In re K.R.B.*, 2017-Ohio-7071, 95 N.E.3d 799, ¶ 13 (8th Dist.). R.C. 3119.01(C)(11)(a) authorizes a court to impute income to a parent whom the court finds is voluntarily unemployed or underemployed. If a trial court determines that a parent is voluntarily unemployed or voluntarily underemployed, the trial court computes that parent's income by adding that parent's potential income to any gross income

he or she may have. *Miller v. Dendinger*, 3d Dist. Seneca No. 13-20-13, 2021-Ohio-546, ¶ 47, citing R.C. 3119.01(C) and 3119.01(C)(17). The question of whether a parent is voluntarily unemployed is a question of fact for the trial court, and a trial court's determination on that issue will not be disturbed unless the trial court is found to have abused its discretion. *Id.*

{¶ 49} Here, the trial court found that Wife had a high school diploma, no physical or mental disabilities that would hinder her ability to work, lived in a metropolitan area, was skilled in childcare having been a stay-at-home parent for approximately 16 years, and could initiate a training program so that she could be gainfully employed. The trial court found that while minimum wage work would garner an income of approximately $17,000 for 50 weeks of the year, potential income of $12,000 should be imputed to Wife to account for her need for training. Based on the foregoing, the trial court did not abuse its discretion in finding Wife voluntarily unemployed and imputing income to her in the amount of $12,000.

{¶ 50} R.C. 3119.01(C)(12) defines "gross income" in relevant part as "the total of all earned and unearned income from all sources during a calendar year" including "spousal support actually received." Here, Husband was ordered to pay $3500 per month in spousal support, less $1736[2] for the mortgage and insurance of the marital home, for a total of $1764 per month or $21,168 per year. Here, the

---

[2] The parties have not questioned this calculation, but it appears to be a typographical error. The sum of the mortgage ($950), car payment ($700), and insurance ($136) totals to $1786.

trial court calculated Wife's gross income on its child support computation worksheet by totaling her imputed income of $12,000 and "other/potential income" of $48,000. Even if the other income omitted the deduction of Wife's child support obligation from Husband's spousal support obligation, the spousal support would amount to $42,000 annually. Because it appears the trial court erred in its calculation of child support based on this error in the worksheet, we reverse the child support order and remand for the limited purpose of allowing the trial court to recalculate based on the spousal support order imposed and discussed below.[3]

**V. Spousal Support**

{¶ 51} In her fifth assignment of error, Wife argues that the trial court erred as a matter of law and abused its discretion as to the term and amount of spousal support.

{¶ 52} The trial court has broad discretion in determining whether an award of spousal support is proper based on the facts and circumstances of each case. *Smith v. Smith*, 8th Dist. Cuyahoga Nos. 110214, 110245 and 110274, 2022-Ohio-299, ¶ 33, citing *Wojanowski v. Wojanowski*, 8th Dist. Cuyahoga No. 99751, 2014-Ohio-697, ¶ 43, citing *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67, 554 N.E.2d 83

---

[3] We note that while Husband presented an argument in response to Wife's argument that the trial court abused its discretion in finding her voluntarily unemployed and imputing income to her, Husband's brief did not present an argument in response to or otherwise reference Wife's argument that the trial court miscalculated her child support obligation based on an incorrect figure on the child support computation worksheet.

(1990). Therefore, we will not disturb the trial court's spousal support order absent an abuse of discretion.

{¶ 53} Trial courts must consider the factors set forth in R.C. 3105.18(C)(1) when determining whether spousal support is appropriate and reasonable. *Id.* citing *Kaletta v. Kaletta*, 8th Dist. Cuyahoga No. 98821, 2013-Ohio-1667, ¶ 22. These factors include the relative earning abilities of the parties, the physical, mental, and emotional conditions of the parties, the duration of the marriage, the standard of living established during the marriage, the relative education of the parties, and the relative assets and debts of the parties, and any other factor the court expressly finds to be relevant and equitable. *Id.*; R.C. 3105.81(C)(1).

{¶ 54} Wife argues that the trial court erred in ordering spousal support for a term of 48 months because this is an insufficient period of time for her to obtain the education, training, and skills necessary to become gainfully employed and it is generally insufficient in light of the lengthy term of the parties' marriage. Wife further argues that the court erred in ordering that spousal support shall terminate upon her remarriage. Finally, Wife argues that the trial court improperly attempted to justify the spousal support order by crediting Husband for his payment of temporary support when, at the time of trial, his temporary support arrearages amounted to over $3,000.

{¶ 55} Here, the trial court addressed the R.C. 3105.81(C)(1) factors and commented on each factor that was relevant to the parties with a thoughtful and lengthy analysis. Specifically, the court considered Husband's greater earning

ability and the fact that Wife has never worked outside the home.  The court also considered that given the children's ages, and the fact that the oldest child helped with childcare, it would not be inappropriate for Wife to seek job training or ultimately employment.  The court also noted that while Wife had not indicated any interest in obtaining education, training, or a job, it was not inappropriate to expect her to do so.

{¶ 56} Additionally, we are unpersuaded by Wife's assertion that four years is an insufficient length of time for her to find gainful employment.  Trial courts are vested with broad discretion to consider such issues; "[s]imply because the court was empowered to impose an indefinite award of spousal support, it does not follow that the failure to do so is an abuse of discretion."  *Lojek v. Lojek*, 4th Dist. Washington No. 10CA8, 2010-Ohio-5156, ¶ 64.

{¶ 57} Finally, with respect to Wife's arguments about Husband's temporary support arrearages, the record is clear that the court considered all aspects of the parties' financial situations, including the contentious history of temporary support.  Nothing in the record indicates that the trial court's spousal support order was unreasonable or otherwise amounted to an abuse of discretion.  Therefore, Wife's fifth assignment of error is overruled.

## VI. Attorney Fees

{¶ 58} In her sixth and final assignment of error, Wife argues that the trial court erred as a matter of law and abused its discretion by denying her request for attorney fees.  There are no "automatic attorney fees" in domestic relations cases,

and when determining whether to award attorney fees in divorce cases, "'the court must start with a presumption that attorney fees are the responsibility of the party who retains the attorney.'" *Victor v. Kaplan*, 2020-Ohio-3116, 155 N.E.3d 110, ¶ 127 (8th Dist.), quoting *Rossi v. Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, ¶ 62, and *Walpole v. Walpole*, 8th Dist. Cuyahoga No. 99231, 2013-Ohio-3529, ¶ 33. Pursuant to R.C. 3105.73(A), a domestic relations court "may award all or part of reasonable attorney's fees to either party if the court finds the award equitable." Further, "in determining whether an award of fees is equitable, the court may consider 'the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.'" *Saks v. Riga*, 8th Dist. Cuyahoga No. 101091, 2014-Ohio-4930, ¶ 89, citing R.C. 3105.73(A) and *Walpole v. Walpole*, 8th Dist. Cuyahoga No. 99231, 2013-Ohio-3529, ¶ 33. "'An award of attorney fees under R.C. 3105.73 lies within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion.'" *Id.*, quoting *Rand v. Rand*, 18 Ohio St.3d 356, 359, 481 N.E.2d 609 (1985).

{¶ 59} Here, the trial court found that while Wife's attorney fees were reasonable, they were "not compensable to her." The court noted that Wife repeatedly criticized the court and refused to take responsibility for any of her expenditures, including her attorney fees, and as such, each party would be responsible for their own attorney fees. Ultimately, the court found it appropriate for each party to pay for their respective attorney fees, finding that after the division

of marital property and determinations of spousal and child support, neither party would have a superior financial ability.

{¶ 60} In light of the foregoing, we cannot conclude that the trial court abused its discretion in denying Wife's request for attorney fees. Therefore, Wife's sixth assignment of error is overruled.

{¶ 61} Judgment affirmed in part, reversed in part, and remanded for the limited purpose of recalculating the child support order in accordance with this opinion.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Domestic Relations Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MARY EILEEN KILBANE, J., CONCUR