[Cite as *Patrick v. Patrick*, 2026-Ohio-450.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

ROBERT M. PATRICK,  :

      Plaintiff-Appellant/  :
      Cross-Appellee,            No. 115037

       :

      v.        :

MICHELLE L. PATRICK,  :

      Defendant-Appellee/  :
      Cross-Appellant.        :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART;
               AND REMANDED
**RELEASED AND JOURNALIZED:** February 12, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-19-379098

---

### *Appearances:*

Meyers, Roman, Friedberg & Lewis LPA and Anne C. Fantelli, *for appellant/cross-appellee.*

Stafford Cruz Law Company and Kelley R. Tauring, *for appellee/cross-appellant.*

DEENA R. CALABRESE, J.:

{¶ 1} Plaintiff-appellant/cross-appellee Robert M. Patrick ("Robert") and defendant-appellee/cross-appellant Michelle L. Patrick ("Michelle") appeal the

decree of divorce issued by the Cuyahoga County Common Pleas Court, Division of Domestic Relations. After reviewing the facts of the case and pertinent law, we affirm in part, reverse in part, and remand for further proceedings consistent with this decision.

## I. Facts and Procedural History

### A. The Marriage

{¶ 2} Robert and Michelle met in 2006, on Halloween, when they "were introduced by a mutual friend." (Feb. 7, 2023 tr. 88-89.) Robert is a physician and was then practicing at the Cleveland Clinic. Michelle had been living in Los Angeles, California, and was home visiting her parents. Within about six months, the couple were cohabiting. They purchased a century home in Cleveland Heights in early 2009. Robert provided the funds for the down payment of approximately $55,000. Robert and Michelle married on September 6, 2009, and continued to live in the same home. The mortgage was retired prior to these divorce proceedings. No children were born as issue of the marriage.

{¶ 3} The record reflects that Michelle struggled with mental-health issues "[a]t least since 2010." (Aug. 4, 2020 tr. 179.) By 2011, Robert and Michelle were in marital counseling, and the counselor referred Michelle to psychiatrist Claudia Metz, M.D. Michelle began seeing Dr. Metz the same year. Consistent with that timeline, Robert conceded in his testimony that Michelle's mental-health struggles, particularly with depression, began well before the divorce. (June 10, 2021 tr. 44 and 54.) "It was bad," he testified, agreeing that it affected Michelle's ability to work,

that she was barely able to function during depressive episodes, and that she was put on antidepressant medications that "were changed several times." (June 10, 2021 tr. 54-58.) At one point, Michelle was taking five different medications at the same time while continuing to struggle with both depression and anxiety. (June 10, 2021 tr. 58; Feb. 7, 2023 tr. 126.)

{¶ 4} Robert testified that he ultimately left Michelle because he could no longer "take [her] excessive spending." (June 10, 2021 tr. 61.) He characterized his own spending habits as "pretty minimalist," mainly limited to "books and tools and a few other things," while Michelle "buys a lot of clothes and make up." (June 10, 2021 tr. 83.)[1] Robert testified that the main issue in their marriage was Michelle's "spending on her own credit cards which were not visible to [him], and accountability around that spending, and accountability around spending from [their] joint checking account." (June 10, 2021 tr. 83-84.)[2] While Robert conceded that some excessive spending was attributable to her mental-health issues, he

---

[1] In his opening brief, Robert describes Michelle as a "spender" and himself as a "saver." Putting aside whether his characterization of Michelle is accurate, the evidence does suggest that Robert qualifies for the "saver" moniker. On the first day of trial, August 4, 2020, Robert testified that despite practicing medicine for many years, he was still driving a 2001 Toyota Camry that he had purchased — used — prior to the marriage. (Aug. 4, 2020 tr. 35.)

[2] The marriage was strained in other respects as well. At trial, Michelle's counsel repeatedly suggested that Robert may have been unfaithful prior to their separation. Whether true or not, Michelle testified without contradiction that she and Robert had not been intimate for about five years and that he considered her "morbidly obese" and "unattractive." (Feb. 7, 2023 tr. 102 and 116.) In addition, Michelle wanted children, while Robert did not. Michelle testified that Robert told her she "would not be a good mother." (Feb. 7, 2023 tr. 109.)

testified that it was unclear how much of it flowed from Michelle's depression and how much was "willful." (June 10, 2021 tr. 61.) He eventually began redirecting his earnings from their joint account to his own account "[b]ecause we weren't saving any money." (June 10, 2021 tr. 88.) Robert testified:

> Michelle was spending all of the money from my paycheck every month and it was a constant source of friction between the two of us, and I asked her to reduce her spending and she wasn't able to do that, and so I redirected my direct deposit into my checking account and then deposited half of my paycheck into our joint checking account.

(June 10, 2021 tr. 88.)

## B. The Separation

{¶ 5} Robert surprised Michelle by moving out of the Cleveland Heights home in March 2019. (June 10, 2021 tr. 63.) By that point, Michelle had been unemployed for approximately nine months. (Aug. 4, 2020 tr. 179.) Before Robert broke the news to Michelle that he was leaving her, they celebrated his birthday, which fell on a Friday. Michelle "baked a cake as [she] always did," and they had "a birthday party with his family." (Feb. 7, 2023 tr. 111.) On Saturday, Michelle spent most of the day with a friend at a Cleveland Botanical Gardens art workshop. On Sunday morning, Robert briefly visited a hardware store, returned home, and sat down with Michelle:

> [H]e said I need to talk to you, please sit down.

> And I sat down and he said, I do not love you anymore. I would like a divorce. I have an apartment, I moved my stuff yesterday while you were at the Botanical Gardens, and I've hired an attorney.

(Feb. 7, 2023 tr. 112; *see also* Aug. 4, 2020 tr. 177 and 186.) Robert confirmed at trial that he had told Michelle he did not love her anymore and "told her [he] was moving out." (Aug. 4, 2020 tr. 177.) He further conceded that Michelle neither asked nor wanted him to leave, that she offered to go back to counseling, and that he even feared she might become suicidal, having told him "maybe I should kill myself." (Aug. 4, 2020 tr. 178, 183, and 185.) In deciding what to take and what to leave, he "removed the guns from the house." (Aug. 4, 2020 tr. 186.)

## C. The Divorce Proceedings

{¶ 6} Robert filed his complaint for divorce on November 5, 2019. Michelle filed her answer and counterclaim on December 5, 2019. Robert replied to the counterclaim on December 19, 2019, and the parties engaged in discovery. Robert filed his financial disclosure affidavit on February 3, 2020. Michelle filed hers on July 31, 2020. Following motion practice, the trial court ordered Robert to pay Michelle temporary support in the sum of $4,000 per month.

{¶ 7} By order dated February 3, 2020, the court scheduled trial for August 4, 2020.[3] Trial commenced that morning before a court magistrate. Robert testified on direct and was cross-examined extensively, but cross-examination was not completed that day. For reasons not evident in the record, trial was not rescheduled

---

[3] Motion practice continued with respect to temporary support, and on July 31, 2020, Robert filed a motion in limine arguing that Michelle should be precluded from entering any exhibits at trial because of her alleged failure to comply with the court's trial order. For purposes of brevity, however, we will omit further discussion of procedural facts (such as these) that are not relevant to the parties' assignments of error.

until December 18, 2020. While there is no formal journal entry, an appearance docket notation on that date indicates trial was rescheduled for June 10, 2021.

{¶ 8} Trial did resume on June 10, 2021. Michelle's counsel continued the cross-examination of Robert but did not complete it. Two more days of trial were then scheduled. Once again, there is no formal journal entry but merely appearance docket notations, both dated June 10, 2021. Trial was set to continue on two dates, August 23, 2021, and November 15, 2021.

{¶ 9} Trial did not proceed on August 23, 2021, though neither a journal entry nor an appearance docket entry indicates the reason. On October 5, 2021, however, the trial court issued an amended trial order stating that trial would be completed on November 15, 2021, and instituting strict time limits on testimony. The amended trial order also required both parties to submit updated financial disclosure statements in accordance with R.C. 3105.171(E)(3) and (5) no later than November 5, 2021.

{¶ 10} On November 4, 2021, Michelle filed a notice of appeal challenging the amended trial order. By journal entry dated November 10, 2021, this court dismissed the appeal sua sponte for lack of a final appealable order.

{¶ 11} The case did not proceed to trial on November 15, 2021. Instead, on that same day, Michelle appealed this court's sua sponte dismissal of her appeal to the Ohio Supreme Court. The Ohio Supreme Court declined to accept jurisdiction on February 24, 2022.

{¶ 12} According to appearance docket notations entered on April 6, 2022, the trial court rescheduled the remainder of the trial for ten months later, on February 6, 7, and 8, 2023. Michelle filed an updated financial disclosure statement on January 30, 2023. On January 31, 2023, Michelle filed a motion requesting to continue the February 6 trial date because of scheduling conflicts. Michelle followed up with a notice of trial conflict on February 1, 2023. By journal entry dated February 3, 2023, the trial court granted the motion to continue as to the February 6 trial date, but ordered that trial resume as previously scheduled on February 7 and 8, 2023.

{¶ 13} Trial resumed on February 7, 2023, with the continued cross-examination of Robert, followed by brief redirect and recross. Robert then called Michelle as if on cross-examination, after which Michelle's counsel conducted her direct examination. On February 8, 2023, Michelle's direct examination continued, followed by brief recross. Trial concluded with Michelle's final witness, Dr. Kiran Rai, who at the time was Robert's romantic partner.

{¶ 14} Over the course of the four days of trial, which focused on the core issues of division of marital property and spousal support, the trial court heard testimony and admitted exhibits into evidence with respect to real estate holdings, financial accounts, retirement accounts, and personal vehicles, as well as credit card debts. Robert was subjected to cross-examination with respect to Michelle's mental-health issues, as well as his purported nondisclosure of certain assets and failure to

provide up-to-date asset valuations for retirement and financial accounts.[4] Michelle testified principally to her mental-health issues and matters pertinent to property division and spousal support, such as lingering debt and her plan to pursue employment and further education.

{¶ 15} On the penultimate day of trial, while Robert was offering exhibits for admission, the magistrate suggested possible supplementation to obtain up-to-date account balances:

> There is an issue with regard to some of these records being outdated, so that's something that the Court's going to consider. Perhaps order the Plaintiff to submit updated documentation so we have the accurate balances on these accounts.
>
> So nonetheless, I'll allow these exhibits in, but subject to a possible order to update. Okay?

(Feb. 7, 2023 tr. 79.)

{¶ 16} At the conclusion of testimony, the trial court directed the parties to submit written closing arguments. The trial court also followed through on its remarks concerning updated financial documentation. By journal entry dated February 8, 2023, it ordered Robert to submit updated financial documents and an updated financial disclosure statement no later than February 16, 2023. After securing an extension of time, Robert filed a notice of compliance on March 10, 2023, as well as an updated (but not notarized) financial disclosure statement.

---

[4] Alleged financial misconduct issues are addressed in more detail in connection with our summary of the trial court's rulings on objection and in our discussion of Michelle's second cross-assignment of error.

{¶ 17} The parties submitted written closing arguments. Robert filed his on April 28, 2023, and Michelle filed hers on June 2, 2023.

**D. The Magistrate's Decision**

{¶ 18} The trial court magistrate filed a decision on July 24, 2023. We again focus only on findings pertinent to this appeal. The magistrate expressly found that the duration of the marriage was from September 6, 2009, until August 4, 2020, the first day of trial. The magistrate further found that based upon personal observation of witness testimony, including gestures and voice inflections, both Robert and Michelle were "generally credible and reliable."

{¶ 19} Following the unchallenged division of real property, personal property, and automobiles, the magistrate turned to financial accounts, finding the following accounts marital in nature:

> Key Bank Checking Account x1913 with an approximate balance of $442.00; Key Bank Checking Account x8632 with an approximate balance of $79,669.00; Key Bank Savings Account x8640 with an approximate balance of $26,050.00; Key Bank Checking Account x7930 with an approximate balance of $6,596.00; and Key Bank Savings Account x7396 with an approximate balance of $29.00.

(Magistrate's decision at p. 5.) Some of the account balances appear to have been derived from Michelle's exhibit No. III and corresponding testimony — specifically, the January 2023 balances in accounts x1913, x8632, and x8640. Key Bank Checking Account x7930 and Key Bank Savings Account x7396 were supported by Michelle's exhibit BBB, and the assigned balances are both as of January 2023.

{¶ 20} The magistrate ordered that account x1913 be closed, with the balance split 50/50. The magistrate further ordered that Robert retain accounts x8632 in

the amount of $79,669.92 and x8640 in the amount of $26,050.55, that Michelle retain accounts x7930 in the amount of $6,596.75 and x7396 in the amount of $29.00, and that Robert pay Michelle the sum of $49,547.36 (representing a 50/50 split of the referenced marital accounts).

{¶ 21} The magistrate found that Robert had opened a separate Key Bank Account (x9324) during the pendency of the divorce and further found that this should be treated as Robert's separate property. Robert had testified without contradiction that Key Bank Account x9324 had been funded solely by "checks that [his] parents have given [him]" and that no marital funds had ever been deposited into that account. (Feb. 7, 2023 tr. 44-45.) Notably, the magistrate provided no rationale for using January 2023 financial account balances rather than balances as of the explicit marriage termination date of August 4, 2020, i.e., the first date of trial.

{¶ 22} The magistrate found certain retirement accounts of both Robert and Michelle to be marital property and ordered that the accounts be divided evenly as of August 4, 2020, the first day of trial. The provenance of the specific dollar amounts assigned as the value of each account is unstated, but they appear to be drawn principally from Michelle's admitted exhibits, the sole exception being Robert's Thrift Savings Account. The balance for that account appears to be drawn from Robert's updated financial disclosure statement, which was never admitted into evidence. The division of Robert's accounts was to be offset by his $82,500 equity interest in the Cleveland Heights marital home.

{¶ 23} The magistrate found that Robert's two remaining retirement accounts, both from the University of Utah, were Robert's separate property.

{¶ 24} The magistrate found that the parties had no joint debts and that any existing debt was each party's respective responsibility.

{¶ 25} Next, the magistrate rejected Michelle's claim that Robert engaged in financial misconduct. After discussing the relevant statutory provision and myriad cases, the magistrate wrote:

> Upon review of the evidence and testimony the Court finds that Plaintiff's conduct does not either rise to the level of financial misconduct, nor warrant a distributive award to Defendant in this matter. Plaintiff asserted his separate property interests in several assets in good faith. Further, although Plaintiff failed to file his updated Financial Disclosure Statements the Court finds that this was a mistake on Plaintiffs part, not made in bad faith, and that Plaintiff submitted his updated Financial Disclosure Statement once notified by the Court of his requirement to do so. Finally, the Court finds that Plaintiff did not initially disclose a retirement asset that was earned prior to the marriage, however, defendant was not harmed by Plaintiff's initial failure to disclose as this retirement account is not a marital asset. Therefore, the Court declines to provide Defendant with a distributive award in this case.

(Magistrate's decision at p. 8.)[5]

{¶ 26} Turning to spousal support, the magistrate noted the statutory factors and found it appropriate for Robert to pay spousal support to Michelle in the amount of $4,000 per month, along with 2 percent processing, for a term of 44 months. The

---

[5] The magistrate's factual recitation is partially incorrect. The transcript reflects that Robert neglected to disclose his Cleveland Clinic Cash Balance Plan, a marital asset. (*See also* Michelle's closing argument brief at p. 8 and Magistrate's decision at p. 6.) Robert had disclosed the existence of his nonmarital retirement accounts (both from the University of Utah) at the outset of this litigation. As discussed below, however, we view the magistrate's minor error as inconsequential.

magistrate expressly based that finding on the factors set forth in R.C. 3105.08(C)(1), including income derived from the property division and other sources, "the relative earning abilities of the parties; the ages and physical, mental and emotional condition of the parties; the duration of the marriage; and the relative assets and liabilities of the parties[.]" (Magistrate's decision at p. 12.)

{¶ 27} Finally, after an extensive discussion of the governing statute and case law, but without reference to any specific facts in this case (e.g., the behavior of either party or their respective attorneys), the magistrate found that "it is equitable and appropriate that each party pay their own individual attorney fees." (Magistrate's decision at p. 11.)[6]

**E. The Objections Phase**

{¶ 28} Each party filed preliminary and supplemental objections to the magistrate's decision. In his two objections, Robert argued that the magistrate erred by using different valuation dates for the parties' assets without explanation and by failing to give Robert credit for temporary support paid during the pendency of the divorce proceedings. In her five objections, Michelle argued that the magistrate erred by ordering Robert to submit financial records and documentation after the completion of trial without giving her an opportunity for cross-examination, that the

---

[6] The closest the magistrate came to a rationale was quoting, with emphasis, this passage from *Oatey v. Oatey*, 1996 Ohio App. LEXIS 1685 (8th Dist. Apr. 25, 1996): "The court must also examine the conduct of the parties to determine at what point the quest for justice ceases, and the legal system becomes a tool used to punish, harass, coerce and intimidate the opposing party." *Id*. at *47, citing *Farley v. Farley*, 97 Ohio App.3d 351, 357 (8th Dist. 1994).

magistrate erred by failing to find that Robert had engaged in economic misconduct and by not ordering a distributive award or treble damages, that the magistrate erred in dividing marital property (and more specifically, purported marital debt), that the magistrate's award of spousal support was insufficient and inequitable, and that the magistrate erred by not awarding Michelle her attorney's fees.

{¶ 29} On June 28, 2024, the trial court filed its judgment entry on the parties' objections. With respect to Robert's objection to using different valuation dates for the assets — specifically, dividing the financial accounts based on balances in early 2023 rather than August 4, 2020, the first date of trial — the trial court held:

> The Court has done a de novo review of this case and finds the following: The trial in this case began on August 4, 2020, and, due to the COVID-19 pandemic and an interlocutory appeal filed by Defendant, was completed on February 8, 2023. During the pendency of the trial the assets in the marital accounts fluctuated considerably. For example, Plaintiff's Exhibit 1, from February 2020, listed the Key Bank Checking Account ending in 8632 with a balance of $20,510.00. However, Plaintiff's updated financial disclosure statement filed on March 10, 2023, in response to the Magistrate's February 2023 Order indicates that the Key Bank Checking Account had a balance of $79,669.00. The parties also have a Key Bank Savings Account ending in 8640. The Savings Account balance increased from $45.00 in 2020 to $26,050.00 in 2023.
>
> For the purposes of the date of divorce, the first date of trial is presumed to be the date used to divide the assets. However, due to the COVID-19 pandemic and the fluctuations in the values of the marital accounts during this extended period of time, it is equitable to divide the marital accounts as of February 2023. Plaintiff's objection is overruled.

(Judgment entry on objections at p. 4.)[7]

{¶ 30} The trial court likewise rejected Robert's second objection, which concerned temporary support. The trial court noted that the purpose of temporary spousal support was to preserve the status quo during divorce proceedings and found that in considering the factors listed in R.C. 3105.18, the final award of $4,000 per month for 44 months was "reasonable and appropriate." (Judgment entry on objections at p. 5.) The court did, however, make what appears to be a typographical error with respect to the duration of the marriage. It wrote that "Plaintiff and Defendant were married on September 6, 2009, until August 4, 2020; approximately twenty-one (21) years or 131 months." (Judgment entry on objections at p. 5.) The beginning and end dates are correct. The duration in *months* is accurate. The calculation of *years*, however — both as spelled out and in parentheses — is inaccurate.

{¶ 31} Turning to Michelle's objections, the trial court first considered whether the magistrate erred by ordering the submission of financial documentation after the completion of trial. While Michelle's objections had not explicitly distinguished between financial accounts and retirement accounts, the trial court did. It first held that the magistrate did not rely on posttrial evidence with respect to financial accounts because those "were either testified to or admitted into evidence as exhibits during the trial." (Judgment entry on objections at p. 5.) With

---

[7] Despite referencing Robert's updated financial disclosure statement in its analysis, the trial court noted later in its opinion that the financial account balances were actually the subject of testimony at trial, as well as exhibits. (Judgment entry on objections at p. 6.)

respect to retirement accounts, however, the trial court noted the magistrate's reliance on updated records but found that Michelle could only have benefited from that decision:

> [T]he Magistrate did rely on Plaintiff's updated financial documents for two (2) of Plaintiff's four (4) retirement accounts that were earned during the marriage, the Thrift Savings Account and Fidelity Rollover IRA. The assets in Plaintiff's Thrift Savings Account and Fidelity Rollover IRA that were testified to and or/ [sic] admitted into evidence as exhibits during the trial were significantly outdated, and in the case of the Thrift Savings Account, significantly lower than what Plaintiff disclosed in his updated financial documents. Therefore, although Defendant was not provided an opportunity to cross-examine Plaintiff on the updated retirement accounts, it would be inequitable for the Court to not consider them in making its decision. Further, if the Court were to use the 2020 Thrift Savings Account and Fidelity Rollover IRA documents in its decision it would only be to Defendant's ultimate detriment.

(Judgment entry on objections at p. 6.)[8] The trial court therefore overruled Michelle's first objection.

{¶ 32} The trial court also rejected Michelle's second objection, which alleged that the magistrate erred in failing to find that Robert had committed financial misconduct by concealing marital assets. After discussing pertinent law, the trial court wrote:

> Upon review, the Court finds that Plaintiff did fail to disclose the updated balances and subsequent value of his assets in 2023. Plaintiff provided his financial information to Defendant in preparation for the August 2020 trial but failed to provide updated financial records between August 2020 and February 2023. Several financial accounts

---

[8] Contrary to the trial court's conclusion, the Fidelity Rollover IRA balance specified by the magistrate appears to be drawn from an admitted exhibit, specifically, Michelle's exhibit VV.

accumulated significant assets during this time and Plaintiff did not provide that information to Defendant.

However, the record does not support Defendant's allegation that Plaintiff deliberately and willfully failed to disclose his updated financial information to deprive Plaintiff of her share of the marital estate. Plaintiff testified that he would have produced the information if he had been instructed by counsel. Further, Defendant did not file a motion to compel or other related motions to obtain updated documents from Plaintiff between August 2020 and February 2023. Plaintiff's failure to disclose updated financial records was certainly not in compliance with this Court's orders, but this failure does not rise to the level of financial misconduct and the requisite wrongful intent. Further, Defendant was not harmed by Plaintiff's failure to disclose and is receiving her share of the marital estate. Defendant's objection is overruled.

(Judgment entry on objections at p. 7.)

{¶ 33} The trial court likewise rejected Michelle's third objection, which concerned the amount and duration of spousal support. The trial court listed the statutory factors, considered Michelle's arguments regarding income disparity and her mental-health issues, and ultimately concluded:

There is evidence in the record that Defendant has mental health issues that make it difficult for her to maintain employment. However, Defendant has a Bachelor's Degree and some credits towards a Master's Degree and Defendant testified that no doctor has told her she cannot work. At the start of Trial Defendant was only 46 years old and she is receiving a significant award from the division of property in this matter. There are no minor children of the marriage. An indefinite period of spousal support is not appropriate.

Upon review of the record and the factors set forth in R.C. 3105.18 the Court finds that an award of $4,000.00 per month for a term of 44 months is reasonable and appropriate in this matter. Defendant's objection is overruled.

(Judgment entry on objections at p. 9.)

{¶ 34} The trial court found some merit to Michelle's fourth objection to the magistrate's decision, which concerned an award of attorney's fees. Michelle claimed she incurred attorney's fees in the amount of $71,360.32 and pointed to disparities in the parties' income and expenses and Robert's purported financial misconduct as justifying the award.

{¶ 35} The trial court had already rejected Michelle's objection related to Robert's alleged financial misconduct. It nevertheless awarded Michelle just under one-half of her claimed attorney's fees based on Michelle's lack of employment and the disparity in the parties' income:

> The Court has reviewed the record and finds that an award of a portion of Defendant's attorney fees and litigation expenses is reasonable and appropriate. Plaintiff's annual income is over $240,000.00 and Defendant does not currently have employment. There is a significant disparity in the parties' incomes. Therefore, the Court finds that an award of $35,000.00 in attorney fees and litigation expenses is equitable in this matter. Defendant's objection is sustained.

(Judgment entry on objections at p. 10.)

{¶ 36} The trial court further found merit to Michelle's fifth objection related to the division of the parties' debts. The trial court found:

> A review of the record shows that although the [$57,259.88] debt is titled solely in Defendant's name, $52,259.88 of the debt is marital debt accrued during the marriage. It is inequitable to allocate that debt only to Defendant. Defendant has an additional $5,000.00 personal loan that she took during the divorce that is her responsibility. Therefore, the Court shall modify the Magistrate's Decision to indicate that Plaintiff and Defendant shall each be responsible for 50% of the marital debt accrued during the marriage. Defendant shall be solely responsible for the $5,000.00 personal loan. Defendant's objection is sustained.

(Judgment entry on objections at p. 10.)

## F. The Final Decree

{¶ 37} The trial court did not immediately enter a final decree of divorce. On July 26, 2024, 28 days after the trial court entered its judgment entry on the parties' objections, Robert filed a notice of appeal. *See Patrick v. Patrick,* No. 114197 (8th Dist.). Four days later, this court dismissed the appeal sua sponte for lack of a final appealable order. After reciting relevant legal authority, this court wrote:

> Here, the trial court thoroughly analyzed and overruled the objections to the magistrate's decision and then adopted the magistrate's decision without setting forth its own independent judgment on the issues submitted to the court for determination. The trial court's decision on the issues submitted to the court is not apparent in the decision and requires the parties to refer to another document, the magistrate's decision, to determine the court's judgment. Therefore, that order does not constitute a final, appealable order. If appellant is able to obtain a final order within 30 days of the date of this order, appellant may motion this court for delayed reconsideration of this order to reinstate the appeal.

{¶ 38} The trial court, however, did not issue its final decree until seven months and three weeks later, on March 21, 2025. A careful review of the final decree confirms that it is substantively identical to the magistrate's decision apart from modifications consistent with the trial court's ruling sustaining certain objections. Neither the magistrate's decision nor the trial court's ruling on objections, however, had established a definite start date for the 44 months of spousal support. The final decree expressly fixed a beginning date of August 1, 2023. In other words, by the time of the March 21, 2025 final decree, Robert was already approximately 19 months into his 44-month support-obligation period.

{¶ 39} Robert filed a timely notice of appeal on April 18, 2025. Michelle filed a timely cross-appeal on April 25, 2025.

## II. Assignments of Error

### A. Robert's Assignments of Error

{¶ 40} Robert's appeal raises three assignments of error:

ASSIGNMENT OF ERROR NO. 1: The Trial Court abused its discretion by using different valuation dates for the parties' assets and by failing to divide the marital assets as of the first date of trial.

ASSIGNMENT OF ERROR NO. 2: The Trial Court abused its discretion when ordering the commencement date and duration of spousal support.

ASSIGNMENT OF ERROR NO. 3: The Trial Court abused its discretion by ordering Robert to pay attorney's fees to Michelle.

### B. Michelle's Cross-Assignments of Error

{¶ 41} Michelle's cross-appeal likewise raises three assignments of error:

CROSS-APPELLANT'S ASSIGNMENT OF ERROR 1: The trial court erred as a matter of law and abused its discretion by ordering the Appellant/Cross-Appellee to submit additional records and documentation after the close of evidence and the conclusion of trial.

CROSS-APPELLANT'S ASSIGNMENT OF ERROR 2: The trial court abused its discretion by failing to find the Appellant/Cross-Appellee guilty of economic misconduct and awarding the Appellee/Cross-Appellant a distributive award.

CROSS-APPELLANT'S ASSIGNMENT OF ERROR 3: The trial court abused its discretion in calculating the Appellant/Cross-Appell[ee]'s spousal support obligations, limiting the term of his support obligations to forty-four (44) months, and failing to retain jurisdiction over the issue of spousal support.

### III. Analysis

#### A. Introduction

{¶ 42} We "generally review a trial court's determination in domestic relations cases for an abuse of discretion." *Hunter v. Troutman*, 2025-Ohio-366, ¶ 63 (8th Dist.), citing *Holcomb v. Holcomb*, 42 Ohio St.3d 128, 130 (1989). In *Hunter*, we noted that "[d]omestic relations courts must have discretion to do what is equitable upon the facts and circumstances of each divorce case." *Hunter* at ¶ 63, citing *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989).

{¶ 43} A trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Hunter* at ¶ 64, citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter* at ¶ 64, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). Where the trial court record "contains competent, credible evidence to support the trial court's decision," there is no abuse of discretion. *Hunter* at ¶ 64, citing *Trolli v. Trolli*, 2015-Ohio-4487, ¶ 29 (8th Dist.). We are not permitted to substitute our judgment for the judgment of the trial court. *Hunter* at ¶ 64, citing *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

{¶ 44} For ease of analysis, we address some of the parties' assigned errors out of order or in conjunction with assigned errors raised by the other party.

## B. Robert's First Assignment of Error and Michelle's First Cross-Assignment of Error

{¶ 45} We address Robert's first assignment of error and Michelle's first cross-assignment of error together because both relate to the valuation of certain marital assets as of specific points in time. In his first assignment of error, Robert argues that the trial court erred by using different valuation dates for the parties' assets and by failing to divide the marital assets, specifically financial accounts, as of the first date of trial. In her first cross-assignment of error, Michelle argues that the trial court erred by ordering Robert to submit additional financial records and documentation after the close of evidence and the conclusion of trial. We find merit to both arguments and remand for further proceedings as specified below.

{¶ 46} While Robert's opening brief refers to both financial accounts (i.e., personal checking, joint checking, and savings accounts) and retirement accounts, he consistently argues that the trial court erred only by ordering that the *financial* accounts be split as of February 2023 rather than the first day of trial, August 4, 2020. This aligns with Robert's supplemental objections filed with the trial court on September 1, 2023. Indeed, Robert noted in his supplemental objections that "throughout the remainder of the [magistrate's decision], the parties are ordered to value and divide all accounts as of August 4, 2020." (Robert's supplemental objections at p. 8.) That included the retirement accounts. In dividing the parties' marital retirement accounts, the magistrate and trial court referenced the balances as of 2023 but ordered that the accounts be divided as of August 4, 2020, the first day of trial.

{¶ 47} Robert argues that dividing the marital financial accounts using their value in February 2023, rather than their value as presented to the trial court on the first day of trial via testimony and exhibits was reversible error. We agree, finding that the trial court failed to adequately justify using different dates for division of the financial accounts versus the retirement accounts.

{¶ 48} "The date of termination of marriage is presumed to be the date of the final hearing in the divorce case." *W.G. v. D.G.*, 2024-Ohio-1690, ¶ 11 (8th Dist.), citing *O'Brien v. O'Brien*, 2008-Ohio-1098, ¶ 40 (8th Dist.). *See also Machen v. Miller*, 2024-Ohio-1270 (8th Dist.). "More specifically, the presumptive date for the termination of a marriage is the first day of trial pursuant to R.C. 3105.171(A)(2)." *Karabogias v. Zoltanski*, 2022-Ohio-3548, ¶ 12 (8th Dist.). "In order to achieve an equitable distribution of property," however, "the trial court must be allowed to use alternative valuation dates where reasonable under the particular facts and circumstances of the case." *Glick v. Glick*, 133 Ohio App.3d 821, 828 (8th Dist. 1999). *See also Karabogias* at ¶ 13; *Abernethy v. Abernethy*, 2002-Ohio-4193, ¶ 19 (8th Dist.); *Keating v. Keating*, 2008-Ohio-5345, ¶ 23 (8th Dist.).

{¶ 49} This court has recognized that while domestic relations trial courts should generally consistently apply the same set of dates when valuing marital property, the circumstances may require different dates for valuation. *Karabogias* at ¶ 13, citing *Weller v. Weller*, 2007-Ohio-4964, ¶ 29 (11th Dist.). Indeed, "'[t]he choice of a date as of which assets available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations.'"

*Karabogias* at ¶ 14, quoting *Berish v. Berish*, 69 Ohio St.2d 318, 319 (1982). The trial court therefore "'has discretion to determine the date of valuation, and this date may vary from asset to asset.'" *Karabogias* at ¶ 14, quoting *Wei v. Shen*, 2003-Ohio-6253, ¶ 21 (12th Dist.). "The trial court, however, 'must adequately explain its reasons for choosing a different valuation date for certain marital assets.'" *Karabogias* at ¶ 14, quoting *Coble v. Gilanyi*, 1999 Ohio App. LEXIS 6267, *9 (11th Dist. Dec. 23, 1999). *See also Saks v. Riga*, 2014-Ohio-4930, ¶ 16 (8th Dist.) ("If the court uses different dates to value certain marital assets, it must adequately explain its reasons for doing so."); *Karabogias* at ¶ 15 (collecting cases).

{¶ 50} In the present case, the trial court magistrate found that the marriage terminated on August 4, 2020, the first day of trial. That finding as to the termination date of the marriage went unchallenged and therefore found its way into the trial court's final decree. The magistrate had ordered that the parties' retirement accounts be divided essentially 50/50 as of the first day of trial, August 4, 2020. The magistrate likewise ordered a 50/50 division of the parties' marital financial accounts, but failed to specify a valuation date. Instead, the magistrate merely listed the updated financial account balances established at trial on February 7, 2023 — two years, six months, and three days after the marriage termination date. The magistrate ignored the balances as of the unrebutted marriage termination date of August 4, 2020, balances established through Robert's case-in-chief. (Aug. 4, 2020 tr. 28; Robert's exhibit Nos. 1, 14, and 15.) The magistrate offered no explanation

for dividing the financial accounts based on their value as of February 7, 2023, rather than as of August 4, 2020.

{¶ 51} In his objections, as here, Robert argued that the growth in certain financial accounts had stemmed from Robert's tendency to be a saver rather than a spender, i.e., that once he began depositing temporary support into Michelle's personal checking account (*see, e.g.,* magistrate's temporary support order filed Mar. 26, 2020, at p. 2), he deposited his remaining income into other financial accounts. Robert had testified, for example, that his earnings were deposited into Key Bank Checking Account x8632 and that he paid support out of that account. The balance in 2020 was $20,510, and the balance in 2023, the number used by the magistrate and ultimately the trial court, was $79,669. (Robert's exhibit No. 1 and Michelle's exhibit No. III.) Robert's Key Bank savings account x8640 was valued at a mere $45 at the time of the first day of trial, but had grown to $26,050 by the time trial concluded in February 2023. (Robert's exhibit No. 1; Michelle's exhibit No. III.)

{¶ 52} We reference these two accounts because they are exactly the two highlighted in the trial court's entry overruling Robert's objections. The trial court justified overruling Robert's objection based on the fact that "the assets in the marital accounts fluctuated considerably" between the beginning of trial on August 4, 2020, and its conclusion over two and one-half years later on February 8, 2023. The trial court noted that these delays were driven at least in part by the COVID-19 pandemic and an interlocutory appeal by Michelle.

{¶ 53} The trial court's statement that "the assets in the marital accounts fluctuated considerably," however, is an observation, not a rationale. As noted above, a domestic relations court has the discretion to determine the valuation dates, which may vary from asset to asset, but those determinations "'must be dictated largely by pragmatic considerations.'" *Karabogias*, 2022-Ohio-3548, at ¶ 14 (8th Dist.), quoting *Berish*, 69 Ohio St.2d at 319 (1982). In *Karabogias*, for example, we noted with approval the principle that "[w]hile the trial court should consistently apply the same set of dates when evaluating all marital property, the trial court has the discretion to use different valuation dates *where the valuation at a certain date was the only evidence before the trial court.*" (Emphasis added.) *Karabogias* at ¶ 15, citing *Homme v. Homme*, 2010-Ohio-6080, ¶ 62 (12th Dist.). In *Karabogias*, as here, the trial court found that the marriage terminated as of the first day of trial, January 8, 2018. The trial court nevertheless divided certain marital assets as of July 23, 2019. This court affirmed, but only after concluding that the trial court had "adequately explained its reasons for utilizing an alternative valuation date to achieve equity." *Karabogias* at ¶ 19. The trial court had "specifically stated that 'each item of marital property will not be valued as of January 8, 2018,' *because wife had not provided valuation of her retirement assets as of the trial date, even though the court had requested it.*" (Emphasis added.) *Karabogias* at ¶ 16. In a nunc pro tunc entry,

> the trial court clarified and confirmed that the divorce decree used an alternative date — July 23, 2019 — for the division of wife's pension *because wife failed to submit evidence of value as of the date of the*

*trial*, and the trial court also affirmed that the utilization of the alternative date would achieve an equitable division.

(Emphasis added.) *Karabogias* at ¶ 17.

{¶ 54} In *Wei*, 2003-Ohio-6253 (12th Dist.), another commonly cited case in this context, the parties had actually agreed to divide their assets as of a specific date, February 6, 2002. The Twelfth District approved the trial court's use of alternative dates, however, based on "pragmatic considerations." *Id.* at ¶ 21. Specifically, the trial court had chosen varying dates for valuing the marital assets because "the evidence adduced at trial did not always correspond to this date." *Id.* The values and dates assigned to each asset, the Twelfth District explained, was instead "established through documentary exhibits and the parties' testimony." *Id.*

{¶ 55} These cases dovetail with those involving claims of de facto marriage termination dates. In such cases, when determining a date for termination of a marriage for purposes of dividing marital assets, "the presence or absence of reliable data concerning the value of the parties' assets is probably the most significant factor the court must consider." *Saks*, 2014-Ohio-4930, at ¶ 10 (8th Dist.). *See also Machen*, 2024-Ohio-1270, at ¶ 52 (8th Dist.). In *Saks*, this court found that "it would have been unreasonable for the court to select an earlier date if the necessary information to make an equitable distribution was not available at that time." *Saks* at ¶ 10. In *Machen*, by contrast, this court upheld the division of assets using a de facto marriage termination date of November 30, 2018, rather than the first day of trial, which commenced on November 4, 2021. There was evidence to support a de facto marriage termination date that preceded the trial date, and from a pragmatic

standpoint, the court wrote "that an abundance of exhibits entered into evidence by both parties at trial contain[ed] financial documents concerning the parties' marital property dating back to at least 2017." *Id.* at ¶ 52. As a result, "the trial court *had reliable data* regarding the parties' finances dating back to at least 2017." (Emphasis added.) *Id.*

{¶ 56} In the present case, the fluctuations (or more accurately, growth) of the financial accounts occurred after the marriage ended because both the magistrate and the trial court found that the marriage terminated on the first day of trial. Both the magistrate's decision and the trial court's final decree divided the parties' marital retirement accounts as of the first day of trial, August 4, 2020. The magistrate's decision divided the marital financial accounts as of February 2023, but does not explain the inconsistency, i.e., why it would be logical and equitable to divide one set of assets as of August 2020 and another as of February 2023, when reliable data was available as of the first day of trial, and where both sets of accounts had grown in the interim.

{¶ 57} The magistrate did not even reference a date for valuation of the financial accounts; the decision merely lists financial account balances from 2023 rather than August 2020. The magistrate never explained why it would be logical or equitable to divide the financial accounts as of February 2023 rather than as of the first day of trial, August 4, 2020.

{¶ 58} The trial court, in overruling Robert's objection, also failed to address the unexplained inconsistency between the magistrate's selection of February 2023

as the date for division of the financial accounts but August 4, 2020, for division of the retirement accounts. In its de novo review, the trial court cited the pandemic, delays, and "fluctuations" in the value of the financial accounts. But nothing in the record suggests Robert was responsible for the trial delays, especially the delays caused by the COVID-19 pandemic and Michelle's unsuccessful interlocutory appeal, and we have already noted that the reference to fluctuations in the financial accounts is more an observation than a rationale.

{¶ 59} In short, at no point did the trial court adequately explain the inconsistency — carried through to the final decree of divorce — in dividing the retirement accounts and the financial accounts as of different dates years apart. Nothing in the magistrate's decision, the trial court's ruling on objections, or the trial court's final decree suggest that a decision to value assets as of different dates was "logically related to the facts of this case." *Kramer v. Kramer*, 1999 Ohio App. LEXIS 3491, *7 (8th Dist. July 29, 1999). In *Kramer*, this court upheld a decision in which the magistrate valued certain retirement accounts as of 1990 but the marital home as of 1995. The magistrate wrote that "'[t]he retirement funds are being valued as of separation [in 1990] for the reason that, in essence, the marriage ended as of separation[.]'" By contrast, the magistrate used a "March 1995 date to value the houses because that date would encompass appellee's improvement dollars and acknowledge that both had continued to pay the mortgages on the property." *Id.* at *6.

{¶ 60} In the present case, the magistrate offered no explanation for using different dates in valuing marital assets, and the trial court's ruling on objections and the final decree did not cure that deficiency. In contrast to the situations presented in *Saks* and *Kramer*, the trial court's decision here reads as a post-hoc rationalization with no logical tie to the underlying facts to justify or otherwise explain the inconsistency. The trial court failed to adequately explain its reasons for utilizing an alternative valuation date to achieve equity and thereby abused its discretion.

{¶ 61} Robert's first assignment of error is sustained, and the case is remanded with instructions for the trial court to divide the parties' financial accounts, like the retirement accounts, as of the first day of trial, August 4, 2020, as established via testimony and admitted exhibits. This is not a remand for a new trial, and it is not an invitation for the trial court to revisit other aspects of the case to rebalance the equities by, for example, increasing the amount or duration of spousal support, modifying the percentage split of the financial or retirement accounts, or otherwise robbing Peter to pay Paul. *See Hissa v. Hissa*, 2010-Ohio-3087, ¶ 30-36 (8th Dist.).

{¶ 62} We next turn to Michelle's first cross-assignment of error, in which she argues that the trial court erred as a matter of law and abused its discretion by ordering Robert to submit additional financial records and documentation after the close of evidence and the conclusion of trial. We find merit to Michelle's argument based on this court's recent decision in *Hunter*, 2025-Ohio-366 (8th Dist.).

"Generally, in rendering a decision, a trial court may only consider evidence admitted at trial." *Id.* at ¶ 115. In *Hunter*, the trial court magistrate had relied on an exhibit not admitted into evidence in awarding attorney's fees in the amount of $192,960.22. Because the exhibit supporting that specific sum had not actually been admitted into evidence, the court held that "it was an abuse of the trial court's discretion to award attorney's fees in the amount of $192,960.22." *Id.* at ¶ 116. This court ordered a very limited remand:

> We sustain Michelle's third assignment of error as it relates to exhibit PPP(1) and remand this matter for the trial court to issue a journal entry to correctly reflect what occurred at trial, specifically that exhibit PPP(1) was not admitted at trial. We find the attorney's fees award in the amount of $192,960.22 was an abuse of discretion. We vacate the trial court's award of $192,960.22 in attorney's fees to Holden and remand the case for the trial court to determine, pursuant to R.C. 3105.73(A) *and the evidence in the record at trial*, an award of reasonable attorney's fees and expenses that the court finds equitable.

(Emphasis added.) *Id.* at ¶ 117.

{¶ 63} Accordingly, it would have been erroneous for the trial court to rely on any posttrial documentation — in this case, an updated financial disclosure statement and any financial and retirement account statements submitted after trial — because such documents, by definition, had not been admitted into evidence at trial.[9] Fortunately, with one exception, the magistrate and trial court used financial figures supported by testimony and admitted exhibits in reaching their decisions.

---

[9] It makes no difference that Robert's updated financial disclosure statement was filed with the trial court. "In making its decision following trial, the trial court may only consider the evidence the court admitted at trial. Other evidence in the record but not admitted at trial may not be considered." *Hoaglin Holdings v. Goliath Mtge., Inc.*, 2004-

{¶ 64} First, we address the parties' marital financial accounts. As the trial court noted in overruling Michelle's objection, the magistrate's findings were supported by testimony and exhibits admitted during trial. Our review confirms that the magistrate's findings with respect to the financial account balances, even while specifying balances as of February 2023, were supported by testimony and exhibits. The balances as of August 4, 2020, were likewise supported by testimony and exhibits. As a result, the trial court has the evidentiary materials required to comply with our remand instructions above, i.e., to divide the financial accounts as of August 4, 2020, based on testimony and exhibits admitted at trial.

{¶ 65} Second, we address the parties' marital retirement accounts. As with the financial accounts, the magistrate and trial court listed 2023 account balances, even while specifying that the retirement accounts were to be divided as of August 4, 2020. The listed balances therefore reflect gains and losses up to January 2023.

{¶ 66} The trial court stated that the magistrate relied on posttrial documents for two of Robert's retirement accounts, the Thrift Savings Account and the Fidelity Rollover IRA. This is only partially correct. The magistrate and trial court assigned a value of $2,502 to Robert's Fidelity Rollover IRA. This figure was supported by Michelle's exhibit VV, a Fidelity Rollover IRA statement ending December 31, 2022. The trial court was correct, however, that the magistrate relied on updated information not admitted into evidence in valuing Robert's Thrift

---

Ohio-3473, ¶ 15 (8th Dist.). In *Hoaglin*, this court explicitly warned against "confus[ing] the concepts of 'evidence in the record' and 'evidence at trial.'" *Id*.

Savings Account x1947 at $148,025. The only admitted exhibits pertaining to the Thrift Savings Account were Robert's exhibit No. 12 (a statement listing a balance of $77,219), Robert's exhibit No. 1 (his 2020 financial disclosure statement containing the same figure), and Michelle's exhibit L (another copy of Robert's 2020 financial disclosure statement with the same dollar figure).

{¶ 67} It was error for the magistrate to specify a value of $148,025 for Robert's Thrift Savings Account where neither testimony nor any exhibit established that precise figure. On remand, the trial court's final decree must be corrected to reflect the only balance supported by the evidence, $77,219 rather than $148,025.

{¶ 68} Unlike the split of marital financial accounts, however, our remand does not require the trial court to completely recalculate the division of defined-contribution marital retirement accounts. The final decree divided the accounts as of August 4, 2020, plus earnings, gains or losses on the awarded shares. The operative feature of this division of property is the as-of date plus the earnings, gains, and losses mechanism. Accordingly, the listing of balances subsequent to August 4, 2020, is not prejudicial to either Michelle or to Robert. *See Saks*, 2014-Ohio-4930, at ¶ 24 (8th Dist.).

{¶ 69} Furthermore, while Robert contested the values to be assigned to the *financial* accounts in his first assignment of error, neither party has expressly challenged the division of the defined-contribution retirement accounts, including the values specified, the date assigned to the division of that property, or the percentage split. *See Snyder v. Old World Classics, L.L.C.*, 2025-Ohio-1875, ¶ 4

("Under the principle of party presentation, 'we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'"), quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); App.R. 16(A)(7).[10]

{¶ 70} Michelle's remaining arguments under this assignment of error merit little discussion. In fact, they confirm the lack of prejudice. Michelle complains that the trial court required Robert to submit updated records but that she had no opportunity to cross-examine Robert regarding such records. Every account, however, was the subject of testimony and was supported by one or more exhibits. Michelle had a full and fair opportunity to cross-examine Robert with respect to each and every account, including, but not limited to, the Thrift Savings Account.

{¶ 71} In that regard, the existence of the Thrift Savings Account was indisputably disclosed to Michelle before the first day of trial. Not only could Michelle cross-examine Robert with respect to that account, but she also could have sought updated records through discovery and sought court intervention in the event Robert refused to cooperate. The record reflects that no motions to compel

---

[10] In *Karabogias*, 2022-Ohio-3548 (8th Dist.), where there was a dispute regarding valuation of a pension, the wife erroneously argued "that documentation regarding the valuation of the pension was not necessary because the pension is a 'defined benefits plan.'" *Karabogias* at ¶ 17, fn. 1. This court held: "'[A]n assigned value for pension funds is necessary for adequate appellate review' and '[a] court's decision to simply divide the marital portion of a pension equally between the two parties, without designating a specific dollar value to the marital portion of the pension, represents an abuse of discretion.'" *Id.*, quoting *Derrit v. Derrit*, 2005-Ohio-4777, ¶ 40, fn. 1 (11th Dist.). Based on the parties' failure to point to a similar dispute in this case, we view *Karabogias* as distinguishable.

were filed either prior to trial or during the long period between the beginning of trial in August 2020 and the conclusion of trial in February 2023.

{¶ 72} Michelle's real argument appears to be that she was precluded from additional cross-examination as to all retirement accounts "after [Robert] was discovered to have concealed his [Cleveland Clinic Cash Balance Plan] retirement account," which she characterizes as demonstrating "a penchant for falsifying financial affidavits, concealing marital property, and acting to intentionally defeat Michelle's property rights." (Michelle's brief at p. 18.) Michelle explicitly states:

> The trial court's mandate that Robert disclose updated valuations and disclosures was not error; it was the trial court's preclusion of Michelle's proper and necessary cross-examination of Robert that necessitates an Order reversing the June 28, 2024 and March 21, 2025 Entries under *Hunter*.

(Michelle's brief at p. 18.) This statement appears to contradict Michelle's own first cross-assignment of error and does little more than muddy the waters. For example, Michelle's exhibit V (a Cleveland Clinic subpoena response dated August 3, 2020) confirms she was on notice of the existence of the Cleveland Clinic Cash Balance Plan and its then-current balance before the first day of trial. On the third day of trial, February 7, 2023, Michelle finally explored Robert's purported concealment of assets during Robert's continued cross-examination, which included cross-examination regarding the Cleveland Clinic Cash Balance Plan.[11] (*See, e.g.*, Feb. 7,

---

[11] In discussing Michelle's second cross-assignment of error below, we conclude that the trial court did not abuse its discretion in finding that Robert's nondisclosure of his Cleveland Clinic Cash Balance Plan was unintentional and that he did not otherwise engage in financial misconduct.

2023 tr. 33; Michelle's exhibit V and Y.) In light of this, Michelle's reframing of the issue suggests that her actual complaint concerns the trial court's time limit on cross-examination.[12]

{¶ 73} Michelle, however, has not separately assigned error to the trial court's limitations on cross-examination. She also did not move for a new trial below, and she has not developed an argument that we should order a new trial to provide her with additional cross-examination time.

{¶ 74} In that regard, even if we were to view Michelle's argument for additional cross-examination as a distinct assignment of error, she has not cited any legal authority in support of her position. "An appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2) if an appellant fails to cite to any legal authority in support of an argument as required by App.R. 16(A)(7)." *Strauss v. Strauss*, 2011-Ohio-3831, ¶ 72 (8th Dist.). We are not obligated to construct or develop arguments for either party or to guess at undeveloped claims. *Story v. Story*, 2021-Ohio-2439, ¶ 30 (8th Dist.). *See also Strauss* at ¶ 72 ("'If an argument exists that can support this assigned error, it is not this court's duty to root it out.'"), quoting *Cardone v. Cardone*, 1998 Ohio App. LEXIS 2028, *22 (9th Dist. May 6, 1998).

{¶ 75} Instead, Michelle limited her legal argument to *Hunter* and similar cases. As discussed above, *Hunter*, like this case, involved the trial court's

---

[12] *See Parsai v. Parsai*, 2025-Ohio-829, ¶ 65 (8th Dist.).

consideration of a document not admitted into evidence. In *Hunter*, this court did not order a new trial or otherwise suggest the trial court could reopen the case; it merely remanded with instructions that the trial court calculate a fee award based on "the evidence in the record at trial." *Hunter*, 2025-Ohio-366, at ¶ 117 (8th Dist.). Michelle has not expressly argued that the remand in this case should be any different.

{¶ 76} Michelle's first cross-assignment of error regarding the trial court's reliance upon financial documents submitted after the conclusion of trial and never admitted into evidence is likewise sustained.

{¶ 77} The case is remanded with the following instructions: With respect to the parties' marital financial accounts, the trial court shall divide the accounts as of the first day of trial, August 4, 2020, using the balances established via testimony and admitted exhibits. With respect to the parties' marital retirement accounts, the trial court's final decree must be corrected as to the balance of Robert's Thrift Savings Account, i.e., to reflect the only balance supported by the evidence ($77,219) rather than $148,025. However, because the final decree divided the marital retirement accounts as of August 4, 2020, plus earnings, gains, or losses on the awarded shares, no further adjustments to the divorce decree are required with respect to the marital retirement accounts. The decree's specification of balances subsequent to August 4, 2020, has not been challenged by Robert and is not prejudicial to Michelle. "'[A]ny error or defect in the proceeding which does not affect the substantial rights of the complaining party may be disregarded,'" and "'the

existence of error does not require reversal of a judgment unless the error is materially prejudicial to the complaining party.'" *Hissa*, 2010-Ohio-3087, at ¶ 19 (8th Dist.), quoting *Fada v. Information Sys. & Networks Corp.*, 98 Ohio App.3d 785, 792 (2d Dist. 1994).

### C. Robert's Second Assignment of Error and Michelle's Third Cross-Assignment of Error

{¶ 78} Robert's second assignment of error and Michelle's third cross-assignment of error both center on the amount and duration of spousal support. Accordingly, we address those assignments of error together.

{¶ 79} In her written closing argument with proposed findings of fact and conclusions of law, Michelle asked the trial court to award her $12,000 per month in spousal support, three times what the trial court ultimately ordered. She also asked for an indefinite period of support subject to the trial court's continuing jurisdiction. Michelle's arguments below, as here, focused principally on the income disparity between Robert and Michelle, the couple's standard of living while married, and Michelle's mental-health issues and limited employment prospects.

{¶ 80} Robert's posttrial proposal represented the other end of the support spectrum: He had asked for credit for his temporary support payments and urged the trial court magistrate to find he should pay only five months of permanent support as a lump sum of $20,000 (i.e., his then-current $4,000 per month support obligation multiplied by five). As discussed above, the trial court ultimately approved the magistrate's recommendation of $4,000 per month of spousal support for a period of 44 months, with permanent support commencing August 1, 2023.

**{¶ 81}** This court has held:

> When awarding spousal support, the "trial court is provided with broad discretion in deciding what is equitable upon the facts and circumstances of each case." *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67, 554 N.E.2d 83 (1990). Thus, a spousal support decision is generally left to a trial court's discretion, subject to the statutory factors set forth in R.C. 3105.18(C).

*Saks*, 2014-Ohio-4930, at ¶ 63 (8th Dist.). R.C. 3105.18(C) provides:

> (1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
>
> > (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
> >
> > (b) The relative earning abilities of the parties;
> >
> > (c) The ages and the physical, mental, and emotional conditions of the parties;
> >
> > (d) The retirement benefits of the parties;
> >
> > (e) The duration of the marriage;
> >
> > (f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
> >
> > (g) The standard of living of the parties established during the marriage;
> >
> > (h) The relative extent of education of the parties;
> >
> > (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
> >
> > (j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any

party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

(2) In determining whether spousal support is reasonable and in determining the amount and terms of payment of spousal support, each party shall be considered to have contributed equally to the production of marital income.

{¶ 82} "A trial court is not required to enumerate each factor in R.C. 3105.18(C)(1), but must provide a sufficient basis to support its award." *Saks* at ¶ 65. Furthermore, "[n]othing in those factors prohibits a trial court from attempting to equalize the parties' income." *Id.* at ¶ 64. Finally, "[w]e will not reverse the trial court's spousal support decision absent an abuse of discretion." *Id.*

{¶ 83} In its final decree of divorce, the trial court wrote:

The Court finds upon considering the factors set forth in Ohio Revised Code Section 3105.08(C)(1), that it is reasonable and appropriate that Plaintiff pay spousal support to Defendant. The Court finds that the following factors support this award: the income of the parties, from all sources, including but not limited to, income derived from property divided, disbursed, or distributed under Section 3105.171 of the Revised Code; the relative earning abilities of the parties; the ages and physical, mental and emotional condition of the parties; the duration of the marriage; and the relative assets and liabilities of the parties,

including, but not limited to, any Court Ordered payments by the parties.

(Final decree at p. 1-2.) This reflects the trial court's consideration of the required statutory factors. "The purpose of spousal support is to achieve equity," and "'equity requires that a disadvantaged spouse receive sufficient spousal support to bring him or her up to a reasonable standard of living in light of the standard maintained during the marriage.'" *Id.* at ¶ 77, quoting *Howell v. Howell*, 2003-Ohio-4842, ¶ 25 (2d Dist.).

{¶ 84} Robert's principal objection is that the trial court did not give him credit, when establishing his final spousal support obligation, for the many months of temporary spousal support paid during the pendency of the divorce proceedings. This included not only initial temporary support but support paid between the commencement of trial on August 4, 2020, and the magistrate's decision on July 23, 2023.

{¶ 85} We reject Robert's arguments. "Temporary spousal support is the support awarded during the pendency of any divorce proceeding[.]" *Saks*, 2014-Ohio-4930, at ¶ 85 (8th Dist.). Its purpose is to maintain the status quo. *Lichtenstein v. Lichtenstein*, 2023-Ohio-3355, ¶ 78 (8th Dist.); *La Spisa v. La Spisa*, 2023-Ohio-3467, ¶ 121 (8th Dist.) ("[T]he purpose of a temporary support order is to 'maintain the present financial status quo of the parties' marriage' and 'support the economically disadvantaged party' while the case is pending."), quoting *Dilacqua v. Dilacqua*, 88 Ohio App.3d 48, 54 (9th Dist. 1993).

{¶ 86} "Permanent spousal support," by contrast, "is the support awarded after the court determines the division or disbursement of property under R.C. 3105.171." *Saks* at ¶ 85. "The purpose of permanent spousal support differs from that of temporary spousal support" in that permanent support is designed to reach an equitable result. *S.M. v. A.P.*, 2025-Ohio-2985, ¶ 58 (8th Dist.). Domestic relations courts, therefore, "are not required to order the commencement of spousal support as of the termination of the marriage date." *Saks* at ¶ 85, citing *Patterson v. Patterson*, 1998 Ohio App. LEXIS 6332 (4th Dist. Dec. 14, 1998).

{¶ 87} In *Saks*, for example, the couple separated in March 2011. *Id.* at ¶ 7. As in the instant case, the husband began voluntarily paying support. *Id.* at ¶ 4. The husband filed for divorce in February 2012, and the trial court ordered temporary spousal support beginning March 1, 2012. *Id.* at ¶ 5. The trial court issued its final decree of divorce in February 2014, ordering 60 months of spousal support commencing March 1, 2014. *Id.* at ¶ 75 and ¶ 84. In one assignment of error, the husband argued that the trial court "discounted the three years of spousal support [the wife] received from the date they separated" to the date of the final divorce decree. *Id.* at ¶ 84. After explaining the distinction between temporary support and a final order of spousal support, this court wrote:

> There is no indication that the court disregarded any support payments Saks was obligated to pay during the pendency of the proceedings when it made its award of permanent spousal support. As previously stated, the aim of any spousal support award is equity. *Kaechele*, 35 Ohio St.3d 93, 96, 518 N.E.2d 1197. The trial court considered all the factors required by R.C. 3105.18(C)(1) and made an equitable spousal support award in both duration and amount based on those factors. Therefore,

> since the spousal support award was equitable under the circumstances of this case, the actual date upon which the spousal support order commenced was of no consequence.

*Id.* at ¶ 86. *Compare Rossi v. Rossi*, 2014-Ohio-1832, ¶ 105-111 (8th Dist.) (upholding trial court decision that explicitly gave husband credit for 22 months of previous support payments where trial court explained that its purpose was to fashion an equitable award of permanent support).

{¶ 88} Here, as in *Saks* and *Rossi*, there is nothing to indicate that the trial court overlooked or otherwise disregarded Robert's temporary support payments, voluntary or otherwise, when it determined the amount and duration of permanent spousal support. In overruling Robert's objections to the magistrate's decision, the trial court, like this court in *Saks*, explicitly referenced the distinction between temporary support and an order of permanent support. It further conveyed its understanding of the duration of Robert's temporary support obligation, noting that between the time a support magistrate entered the temporary support order in March 2020 and the trial magistrate issued a decision in July 2023, Robert had been paying temporary support for "approximately 40 months." It nevertheless ruled that based on a marriage of approximately 131 months and "[c]onsidering the factors listed in R.C. 3105.18, an award of $4,000.00 per month in spousal support for 44 months is reasonable and appropriate." In its March 21, 2025 final divorce decree, the trial court ordered that Robert's permanent support obligation commenced effective August 1, 2023, the first day of the month following release of the magistrate's decision. (In other words, the trial court did not order the 44 months

to commence at the time it journalized the final decree of divorce.) All of this reflects the trial court's careful consideration of the statutory factors based on competent, credible evidence, as well as further consideration of Robert's history of paying temporary support.

{¶ 89} In *Saks*, 2014-Ohio-4930 (8th Dist.), the trial court ordered the husband, who had a lucrative private-practice legal career, to pay $3,500 per month in spousal support to the wife, a government attorney. *Saks* at ¶ 78. Support was to continue for 60 months or until the wife remarried. *Id.* This court found the award equitable based in part on "the large discrepancy in the parties' income[.]" *Id.* at ¶ 78. The present case presents an even wider income disparity and is further complicated by Michelle's mental-health struggles and her resulting difficulties maintaining stable employment. We find and conclude that the trial court's award of 44 months of spousal support commencing August 1, 2023, in the amount of $4,000 per month, was not an abuse of discretion.

{¶ 90} As a result, we likewise reject Michelle's argument that the trial court erred by ordering too little support, i.e., that it should have ordered Robert to pay her $12,000 per month indefinitely. The record reflects that the trial court considered Michelle's arguments with respect to income disparity, mental health, and standard of living in determining the amount and duration of permanent support, rejecting Robert's argument for comparatively little permanent support ($20,000, paid as a lump sum) and instead ordering continued support for an extended period of 44 months, which will ultimately total $176,000. The record

suggests this was an equitable award. While the evidence confirmed Michelle's struggle with mental health, at the time of trial, she was not yet 50 years old and there was no evidence Michelle was permanently unable to work. She even testified that no doctor had ever told her she was unable to work. (Feb. 7, 2023 tr. 65-66.) Indeed, Michelle testified that she was looking for employment and that she had been accepted into a master's program. (Feb. 7, 2023 tr. 54-55 and Feb. 8, 2023 tr. 27.) She testified she wanted to "get [her] career back on path[.]" (Feb. 8, 2023 tr. 28.) In light of the parties' competing proposals with respect to the amount and duration of support, and the multitude of factors considered by the trial court, we find no abuse of discretion in the trial court's final spousal support award. Robert's second assignment of error and Michelle's third cross-assignment of error are overruled.

## D. Michelle's Second Cross-Assignment of Error

{¶ 91} In her second cross-assignment of error, Michelle argues that the trial court erred by failing to find that Robert committed economic misconduct. Michelle contends that Robert committed financial misconduct and that the trial court should have ordered a distributive award. We find no merit to Michelle's arguments.

{¶ 92} This court has recently reiterated that R.C. 3105.171(E)(4) "provides that if a spouse has engaged in financial misconduct, including but not limited to the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." *Anderson-Fye v. Mullinax-Fye*, 2024-Ohio-5909, ¶ 94-

95 (8th Dist.), citing *A.E. v. J.E.*, 2024-Ohio-1785, ¶ 28 (8th Dist.). "'The distributive award concept is consistent with the well-established principle that trial courts have broad discretion when creating an equitable division of property in a divorce proceeding.'" *Strauss*, 2011-Ohio-3831, at ¶ 39 (8th Dist.), quoting *Adams v. Chambers*, 82 Ohio App.3d 462, 466 (12th Dist. 1992); *La Spisa*, 2023-Ohio-3467, at ¶ 72 (8th Dist.) (same).

{¶ 93} "The complaining spouse bears the burden of proving the financial misconduct." *Anderson-Fye* at ¶ 94, citing *A.E.* at ¶ 28, citing *Victor v. Kaplan*, 2020-Ohio-3116, ¶ 138 (8th Dist.). "'A spouse commits "financial misconduct" where he or she engages in intentional conduct by which he or she either profits from the misconduct or intentionally defeats the other spouse's interest in marital assets.'" *A.E.* at ¶ 29, quoting *Victor* at ¶ 138, citing *Rodgers v. Rodgers*, 2017-Ohio-7886, ¶ 30 (8th Dist.).

{¶ 94} Upon our independent review of the record, we find that the trial court did not abuse its discretion in finding that Robert did not intentionally conceal assets or otherwise engage in financial misconduct. We turn first to disclosures concerning the parties' financial accounts. Without excusing Robert's failure to file updated financial disclosure statements, we have separately concluded, in resolving Robert's first assignment of error in his favor, that the trial court erroneously divided the financial accounts based on the balances in January 2023 rather than the first date of trial, August 4, 2020. Moreover, the record supports the conclusion that Robert never concealed the *existence* of any marital financial accounts. The only

new account that might have been listed on an updated financial disclosure statement was Key Bank Checking x9324, which the magistrate and trial court concluded was opened during the pendency of the divorce and was therefore not marital property.

{¶ 95} The subject of retirement accounts is somewhat more complicated. Following our extensive review of the record, we find that the magistrate erred in concluding that Robert "did not initially disclose a retirement asset that was earned prior to the marriage, however, defendant was not harmed by Plaintiff's initial failure to disclose as this retirement account is not a marital asset." (Magistrate's decision at p. 8.) The magistrate appears to have confused Robert's nonmarital University of Utah Defined Contribution Plan and Discontinued 403(b) Plan with his Cleveland Clinic Cash Balance Plan. Robert in fact disclosed the existence and then-current balances of the two University of Utah retirement accounts (the only retirement accounts deemed nonmarital) in his February 20, 2020 financial disclosure form. As Michelle correctly argued in her written closing argument to the magistrate, Robert actually failed to disclose the existence of the Cleveland Clinic Cash Balance Plan, which was indisputably a marital asset.

{¶ 96} The magistrate's minor error in identifying the omitted disclosure, however, does not alter the outcome. Robert still explained this omission during his cross-examination. Robert's attorney filed his initial disclosure statement in February 2020. By that time, Robert was not only almost six years removed from his employment with the Cleveland Clinic, but he had been living in an apartment

rather than the marital home for nearly a year. Robert testified on cross-examination that account statements were being sent to the marital home and he had overlooked the Cleveland Clinic Cash Balance Plan when cataloging marital retirement assets. (Feb. 7, 2023 tr. 33.) The statements themselves confirm they were addressed to the marital home. (Michelle's exhibits V and Y.) The trial transcript does not reflect a scheme to conceal assets, and there was no suggestion that Robert dissipated or disposed of marital property. *Cf. Bertalan v. Bertalan*, 2025-Ohio-1443, ¶ 81 (8th Dist.) (husband attempted to sell condominium without wife's consent or a court order).

{¶ 97} Furthermore, on redirect, Robert's attorney established that Michelle was made aware of the existence of the account, albeit via the Cleveland Clinic's response to Michelle's subpoena, no later than August 3, 2020, before the start of trial. (Feb 7, 2023 tr. 42; Michelle's exhibit V.) Michelle was therefore aware of the account not only on the first day of trial on August 4, 2020, but also while the case limped into 2021, 2022, and finally 2023. Even during that extensive time frame, Michelle did not file a motion to compel or any other motion seeking financial documents. *See Saks*, 2014-Ohio-4930, at ¶ 17 (8th Dist.) (husband had "not identified anywhere in the record where he sought court intervention to obtain evidence of" allegedly concealed accounts).

{¶ 98} The magistrate, who observed Robert's testimony, was convinced that Robert had made an honest mistake and did not intend to conceal assets. This court has consistently held:

"The credibility of a witness is primarily for the trier of fact to assess." *Khatib v. Peters*, 2017-Ohio-95, 77 N.E.3d 461, ¶ 28 (8th Dist.). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

*Machen*, 2024-Ohio-1270, at ¶ 74 (8th Dist.). This deference likewise extends to trial court magistrates when they function as the sole triers of fact. "[W]hen a magistrate comments on credibility and the trial court does not take additional evidence . . . the judgment of the magistrate on issues of credibility is, absent other evidence, the last word on the issue for all practical purposes." (Cleaned up.) *Pitrone v. Pitrone*, 2025-Ohio-367, ¶ 12 (8th Dist.). *See also S.S. v. T.M.*, 2025-Ohio-1827, ¶ 29 (8th Dist.) (agreeing with trial court that where case turns on credibility, "the magistrate was in the best position to assess [the parties'] credibility").

{¶ 99} The trial court, upon its own review, expressly found that the record did not support Michelle's argument that Robert intentionally concealed assets, that any oversight "does not rise to the level of financial misconduct and the requisite wrongful intent[,]" and that Michelle was "receiving her share of the marital estate" and was therefore not harmed in any fashion. On this record, and in light of the relevant case law surrounding issues of intentional financial misconduct, we find that the trial court did not abuse its discretion. Accordingly, we overrule Michelle's second cross-assignment of error.

### E. Robert's Third Assignment of Error

{¶ 100} In his third assignment of error, Robert argues that the trial court abused its discretion by ordering him to pay attorney's fees to Michelle. This court has stated that

> "[t]here are no 'automatic attorney fees' in domestic relations cases, and when determining whether to award attorney fees in divorce cases, 'the court must start with a presumption that attorney fees are the responsibility of the party who retains the attorney.'" (Cleaned up.) *A.A.O. v. A.M.O.*, 2022-Ohio-2767, ¶ 58 (8th Dist.), quoting *Victor v. Kaplan*, 2020-Ohio-3116, ¶ 127, 155 N.E.3d 110 (8th Dist.). "It is well-established that an award of attorney fees is within the sound discretion of the trial court." *Rand v. Rand*, 18 Ohio St.3d 356, 359, 481 N.E.2d 609 (1985); *see also A.A.O.* at ¶ 58, citing *Saks v. Riga*, 2014-Ohio-4930, ¶ 89 (8th Dist.). An "award [of attorney's fees] will not be overruled absent an attitude that is unreasonable, arbitrary, or unconscionable." *Cyr v. Cyr*, 2005-Ohio-504, ¶ 70 (8th Dist.). Therefore, this Court will not reverse a trial court's award of attorney's fees absent an abuse of discretion. *Wilson v. Wilson*, 2023-Ohio-1752, ¶ 23 (8th Dist.). "Under this highly deferential standard of review, we 'may not freely substitute [our] judgment for that of the trial court.'" *Allan [v. Allan]*, 2019-Ohio-[2111,] at ¶ 95 [(8th Dist.)], quoting *Dannaher v. Newbold*, 2007-Ohio-2936, ¶ 33 (10th Dist.). "A court may award reasonable attorney fees if it determines that the award is equitable.["] *Allan* at ¶ 100.

*E.A. v. A.A.*, 2025-Ohio-4583, ¶ 59 (8th Dist.). "In determining whether an award of attorney fees is equitable, 'the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.'" *Rossi v. Rossi*, 2014-Ohio-1832, ¶ 100 (8th Dist.), quoting R.C. 3105.73(A).

{¶ 101} As discussed above, the trial court magistrate had declined to award attorney's fees to Michelle. Michelle timely objected, arguing that she incurred attorney's fees in the amount of $71,360.32. She pointed to disparities in the parties'

income and expenses, as well as to Robert's purported financial misconduct, as justifying the award. The trial court sustained the objection. Because the trial court, like the magistrate, found no evidence of financial misconduct, it focused on income disparity, noting that there was a "significant disparity" in that Robert's "annual income is over $240,000.00 and Defendant does not currently have employment." (Judgment entry on objections at p. 10.)[13] It ultimately awarded Michelle $35,000, which is just under one-half her claimed fees.

{¶ 102} Robert argues that the trial court "magistrate was in the best position to evaluate the trial cadence and behavior and as such determined that attorney fees were not warranted." (Robert's brief at p. 20.) Unlike the magistrate's determinations of credibility, however, the "trial cadence," as well as the behavior of counsel, can be determined from a review of the transcript. Every objection and other interruption is apparent from the transcript, and credibility is not at issue because the alleged disruptions were by counsel.[14] The trial court, therefore, did not inappropriately discount any credibility determinations made by the magistrate.

---

[13] Without separately assigning error, Robert implies that the trial court should not have considered "Michelle's untimely filed Supplemental Objections to the Magistrate's Decision." Michelle's supplemental objections, though untimely, were accompanied by a motion for leave to file the supplemental objections instanter. While the trial court did not explicitly rule on the motion for leave, its consideration of the supplemental objections reflects the granting of that motion. *See Samman v. Nukta*, 2005-Ohio-5444, ¶ 13, fn. 1 (8th Dist.) (While the "court did not explicitly rule on the motion for leave to amend . . . its order granting summary judgment on statute of limitations grounds implicitly granted it."); *see also Carpet Barn v. CSH, Inc.*, 1997 Ohio App. LEXIS 2445, *3 (8th Dist. June 5, 1997); *Debaggis v. Univ. of Notre Dame*, 1983 Ohio App. LEXIS 14739, *3 (8th Dist. Aug. 4, 1983).

[14] Neither side contends that the parties themselves were disorderly or contributed to any trial delays. The transcript instead suggests, and the magistrate confirmed, that both

{¶ 103} Furthermore, in addition to income disparity, the record reflects that Michelle borrowed money from a friend in order to pay her attorney's retainer. (Feb. 7, 2023 tr. 134.) The same amount is listed as an unsecured debt on her financial disclosure statements. (Michelle's exhibit P and BBB.) Michelle testified that the last payment she had made to her attorney was only $180. (Feb. 7, 2023 tr. 68-69; Feb. 8, 2023 tr. 38.)

{¶ 104} Robert's argument that Michelle failed to provide sufficient evidence of the actual value of services is likewise not well taken. At the conclusion of trial, the following exchange occurred with respect to stipulating to the reasonableness of Michelle's attorney's fees:

> [Exhibits] Triple M and MMM-1 are the rates. The outstanding amounts *which we want a stipulation on is fair, reasonable, and necessary is the amounts set forth on page 14.*
>
> Total amount of fees and expenses as of the date of last charge was $71,360.32. Of that, $4,243.32 were expenses.

(Emphasis added.) (Feb. 8, 2023 tr. at 93-94.) The magistrate stated: "Is that acceptable, counsel, on behalf of Plaintiff?" (Feb. 8, 2023 tr. at 94.) Robert's counsel responded, "[y]es," and the magistrate stated that the court would accept the stipulation. (Feb. 8, 2023 tr. at 94.)

{¶ 105} "A stipulation is 'a voluntary agreement entered into between opposing parties concerning the disposition of some relevant point in order to avoid the necessity for proof on an issue' or to 'narrow the range of issues to be litigated.'"

---

Michelle and Robert testified in a forthright manner, even when latter had to endure a prolonged cross-examination.

*Stratton v. Stratton*, 2019-Ohio-3279, ¶ 17 (8th Dist.), quoting *Bodrock v. Bodrock*, 2016-Ohio-5852, ¶ 19 (8th Dist.). Accordingly, a stipulation "'renders proof unnecessary.'" *Stratton* at ¶ 17, quoting *Rice v. Rice*, 2001 Ohio App. LEXIS 4983, *11 (8th Dist. Nov. 8, 2001). Robert cannot complain with respect to the value of Michelle's attorney's fees.

{¶ 106} Given the highly deferential standard of review, we decline to disturb the trial court's ruling awarding Michelle just under half of her claimed attorney's fees. The trial court did not abuse its discretion, and Robert's third assignment of error is overruled.

{¶ 107} Judgment affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Specifically, on remand, the trial court shall divide the parties' financial accounts as of the first day of trial, August 4, 2020, using the balances established via testimony and admitted exhibits. Furthermore, with respect to the parties' marital retirement accounts, the trial court's final decree must be corrected with respect to the balance of Robert's Thrift Savings Account, i.e., to reflect the only balance supported by the evidence, $77,219.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

MICHAEL JOHN RYAN, P.J., and
ANITA LASTER MAYS, J., CONCUR